# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

NINTENDO OF AMERICA INC.,

     Plaintiff,

v.

JESSE KEIGHIN, individually,

     Defendant.

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

---

## PRELIMINARY STATEMENT

Plaintiff Nintendo of America Inc. ("Nintendo of America Inc." or "Plaintiff"), by and through its counsel, and on personal knowledge as to its own actions and on information and belief as to the actions, capabilities, and motivations of others, hereby alleges as follows:

1.    Nintendo of America Inc., a wholly owned subsidiary of Nintendo Co., Ltd., markets and distributes electronic video game consoles, games, and accessories developed by Nintendo Co., Ltd., including the Nintendo Switch, Nintendo Switch Lite, and Nintendo Switch OLED consoles (collectively, the "Nintendo Switch"). Nintendo of America Inc. and Nintendo Co., Ltd. are together referred to herein as "Nintendo." Nintendo also makes and releases award-winning and beloved video games that can be played only on the Nintendo Switch. These games are highly anticipated each year and include such well-known franchises as *Super Mario* and *The Legend of Zelda*. Nintendo has sold over 143 million Nintendo Switch consoles (and counting), making it the third most popular video game console of all time.

2.     Defendant Jesse Keighin is an individual who streams pirated video games on several online platforms, including platforms like YouTube, Discord, Twitch, TikTok, Trovo, Kick, Vaughn, Dlive, Picarto, Nimo, Facebook, and Loco, under the username (pseudonym) "Every Game Guru" or variations thereof, such as "everygameguru3." Defendant is a recidivist pirate who has obtained and streamed Nintendo's leaked games on multiple occasions. Leaked games (sometimes referred to as "prerelease games") are copyrighted video games which Nintendo has not yet publicly released. These games are illegally obtained and then shared online for anyone with Internet access to download illegally (pirate), resulting in significant prerelease piracy.

3.     Starting in as early as 2022, Defendant has streamed unauthorized gameplay of at least ten of Nintendo's leaked games before their publication, and more than fifty times in total. Nintendo has submitted dozens of takedown notices pursuant to Section 512 of the Copyright Act to have Keighin's unlawful streams removed, and recently multiple platforms, such as YouTube and Twitch, shut down his channels because of copyright strikes.[1] Despite these immense efforts by Nintendo to enforce its rights short of litigation, Defendant continues to unlawfully stream Nintendo's copyrighted works and thumb his nose at Nintendo and the law. On October 24, 2024, after certain platforms had taken down his unlawful streams as a result of Nintendo's enforcement actions, he sent Nintendo a letter boasting that he has "a thousand burner channels" to stream from and "can do this all day." Recently, after Defendant's monetized YouTube account was slated to be shut down, Defendant began adding a CashApp handle to his streams, continuing to seek to profit off of his unauthorized streaming of Nintendo's games. On top of his own flagrant piracy,

---

[1] Copyright owners can demand the removal of infringing content from websites and other online platforms by sending a takedown notice under 17 U.S.C. § 512 to the platform owner. This often results in a "copyright strike" and platforms may institute recidivist rules to suspend or shut down user accounts based on the number of strikes they receive, as part of the platforms' statutory obligation to "terminat[e] . . . repeat infringers," *id*.

he has also posted links to repositories of pirated game files ("ROMs"[2]) encouraging and inducing his followers and viewers to unlawfully reproduce Nintendo's games.

4.     Defendant Keighin often streams himself playing leaked games in unauthorized ways, including on an unlawfully modified console or using a video game emulator, which is a piece of software that allows users to play unauthorized or pirated copies of video games developed for a specific console on another unauthorized device. In this case, Keighin uses emulators to play pirated copies of Nintendo Switch games on his PC—games that, when lawfully purchased, Nintendo authorizes for play solely on Nintendo Switch consoles, and not PCs. Nintendo Switch consoles include technological measures that, among other things, prevent play of infringing game copies. The use of emulators, which circumvent these technological measures, allow people such as Defendant to play pirated Nintendo Switch games—including leaked games—on PCs, Macs, and Android devices. In addition to streaming games from emulators, Defendant has also publicly posted links to those emulators—including ones called Yuzu and Ryujinx—thus trafficking in that unlawful software.

5.     While all of Defendant's infringement is harmful, his repeated infringement of prerelease games is especially damaging. Streaming leaked games prior to their publication normalizes and encourages prerelease piracy—Defendant is signaling to viewers that they too should acquire a pirated copy and play the game *now*, without waiting for its release and without paying for it. Prerelease piracy harms law-abiding Nintendo customers who may have been waiting for a particular game release for months or years, and then may see gameplay and spoilers online that ruin their own surprise and delight when experiencing the game. In turn, prerelease piracy causes Nintendo tremendous harm, including millions of dollars of monetary harm from

---

[2] ROM stands for read-only memory and is the colloquial term for unauthorized copies of games.

lost video game sales both of Nintendo's and its licensees' copyrighted games, and loss of goodwill.

6.      To protect its intellectual property rights and its investment, as well as the investments of its third-party developers—including to secure its games against prerelease piracy—Nintendo designed the Nintendo Switch console and Nintendo Switch games with sophisticated security features (sometimes referred to as technological protection measures or TPMs, and referred to herein as Nintendo's "Technological Measures") to prevent people from accessing, copying, or playing unauthorized or pirated copies of Nintendo's video games, whether on Nintendo Switch consoles or on other platforms.  Specifically, as described in more detail herein, every Nintendo Switch game stored on a Nintendo physical cartridge or on a Nintendo Switch console as a digital download is secured with multiple Technological Measures, including encryption that scrambles the audiovisual content in the game file to make it unreadable without the use of proprietary cryptographic keys available to the console, commonly referred to as "prod.keys."  In the ordinary course of operation, an authentic Nintendo Switch console will use these "prod.keys" to decrypt other cryptographic keys associated with games, and then use those keys to decrypt lawfully purchased games during runtime.[3]  Only if the games are dynamically decrypted during operation of the console may the user play those games.

7.      Nintendo also has Technological Measures on the Nintendo Switch console itself, including additional layers of encryption, which, among other things, prevent users from unlawfully modifying or "hacking" the console and unlawfully accessing the console software—

---

[3] Each act of decryption discussed herein—along with additional decryption operations performed by the console in the ordinary course—relies on one or more different cryptographic keys, each of which is only available to the console, except when extracted by circumvention software such as a piece of software called "Lockpick."

including to extract the prod.keys—and from accessing or copying games stored on the console or on a cartridge inserted in the console.

8.      Nintendo Switch emulators, including but not limited to Yuzu and Ryujinx, unlawfully circumvent the Technological Measures on Nintendo Switch games and allow for the play of encrypted Nintendo Switch games on devices other than a Nintendo Switch.  Nintendo Switch emulators do this by executing code necessary to defeat Nintendo's many Technological Measures associated with its games, including code that decrypts the Nintendo Switch game files immediately before and during runtime using an illegally-obtained copy of prod.keys (that ordinarily are secured on a Nintendo Switch console).  Users, such as Defendant, must obtain the prod.keys either through unlawful websites or by unlawfully hacking a Nintendo Switch console. In fact, Defendant has posted links to copies of these prod.keys, as well as the emulators themselves and repositories of pirated ROMs, further distributing all the necessary piracy tools to his viewers.

9.      With an emulator in hand, nothing stops a user from obtaining and playing unlawful copies of virtually any game made for the Nintendo Switch console, all without paying a dime to Nintendo or to any of the hundreds of other game developers and publishers making and selling games for Nintendo Switch.  In effect, emulators turn general computing devices into tools for massive intellectual property infringement of Nintendo and others' copyrighted works.

10.      Defendant's unlawful conduct has caused Nintendo and all those third parties that develop games for the Nintendo Switch console tremendous harm.  Nintendo's copyrighted games are at the heart of the company, and Nintendo's business necessarily relies upon the authorized and licensed distribution of authentic copies of its video games, and upon the trust of third-party game developers that the games they develop will be secure on Nintendo's consoles and will not

be illegally distributed or played.  This is exactly why Nintendo has invested and continues to invest in Technological Measures to secure its consoles and games.

11.    Indeed, multiple U.S. federal courts have entered judgments providing that trafficking in devices that circumvent the Technological Measures on the Nintendo Switch console and Nintendo Switch games, including an emulator, violates 17 U.S.C. § 1201.  *See Nintendo of America Inc. v. Tropic Haze LLC*, No. 1:24-cv-00082 (D.R.I. 2024); *Nintendo of America Inc. v. Dilts et al.*, No. 3:20-cv-01076 (N.D. Ohio 2020); *Nintendo of America Inc v. ANXCHIP.COM et al.*, No. 2:20-cv-00738-TSZ (W.D. Wash. 2020); *Nintendo of America Inc v. Gary Bowser*, No. 2:21-cv-00519-RSL (W.D. Wash. 2021); *United States v. Louarn et al.*, No. 2:20-cr-00127-RSL (W.D. Wash. 2020).

12.    Nintendo authorizes copies of its Nintendo Switch games to be played only on Nintendo Switch consoles.  As noted above, in addition to the game Technological Measures, Nintendo protects its games behind additional Technological Measures on Nintendo Switch consoles.  To get any game off a Nintendo Switch console and into an emulator environment to be played, therefore, Defendant must: (1) obtain a Nintendo Switch console's cryptographic keys (the prod.keys) either from a hacked console or illegally online, which as noted violates Nintendo's rights under Section 1201 of the Copyright Act; and (2) make at least one unauthorized copy of a Nintendo Switch game (either by extracting or "dumping" the file from a cartridge or downloading it from a pirate website), which, when the copied game is Nintendo's, violates Plaintiff's right of reproduction under the Copyright Act, 17 U.S.C. §§ 106, 501, entitling Plaintiff to the relief sought herein.  Subsequently, streaming gameplay of that game (particularly prior to its release by the copyright owner) violates Plaintiff's right of public performance under the Copyright Act, entitling Plaintiff to the relief sought herein.  And the streaming of gameplay for games that have not even

been released to the public yet is willful and blatant copyright infringement, especially when—as in this case—it is done knowingly and repeatedly.  It also violates Nintendo's Game Content Guidelines for Online Video & Image Sharing Platforms, which make clear that "[y]ou are only permitted to use Nintendo Game Content that is generated after the game has been officially released."

13.    Defendant is fully aware of the use of emulators to perform circumvention, and to facilitate piracy on a colossal scale.  By not only streaming leaked games, but also directly providing users links to circumvention software (Nintendo Switch emulators), Nintendo's proprietary cryptographic keys (prod.keys), and pirated ROM repositories, Defendant is giving his viewers everything they need to pirate as many games as they wish.  Indeed, Defendant recently boasted online that he wants to *"help[] anyone and everyone who wants to get Nintendo games for free (and early), or who needs help installing and setting up . . . [Nintendo] Switch emulators that let you play [Nintendo] Switch games for free."*

14.    Defendant's distribution of emulators, prod.keys, and repositories of pirated ROMs to the public materially contributes to and induces his viewers to infringe the copyrights in Nintendo's games.  Defendant is thus secondarily liable for the infringement committed by the users to whom he distributes circumvention software, unlawful prod.keys, and repositories of pirated ROMs.

15.    Nintendo has invested enormous resources into protecting the Nintendo Switch console and its games through Technological Measures to ensure that Nintendo's games are purchased lawfully and not illegally copied, are not leaked before publication, and that the integrity of Nintendo's ecosystem remains safe and free of piracy and cheating.  This protects the tremendous creative investment of Nintendo and its employees and of hundreds of its third-party

licensees. Defendant has streamed numerous leaked games before publication and has also provided any Internet user in the world with the means to unlawfully decrypt and play virtually any Nintendo Switch game and to illegally download any Nintendo game. And to be clear, there is no lawful way to use emulators like Yuzu or Ryujinx to play Nintendo Switch games, because it must decrypt the games' encryption, nor is there a lawful way to play leaked games. Defendant must be held accountable for willfully violating Nintendo's exclusive rights and for willfully providing his viewers the means to violate Nintendo's intellectual property rights at a wide scale. The harm to Nintendo is manifest and irreparable.

16.     Recognizing the threats faced by copyright owners like Nintendo in an age of digital piracy, Congress enacted as part of the Digital Millennium Copyright Act ("DMCA") the anti-circumvention and anti-trafficking provisions of the Copyright Act, 17 U.S.C. § 1201 *et seq.*, making it illegal to circumvent encryption or other technological measures put into place by copyright owners to protect against unlawful access to and copying of copyrighted works, and to traffic in devices or software that are primarily designed to circumvent such measures.

17.     Defendant's actions fall squarely within these provisions. Defendant unlawfully acquires unauthorized copies of Nintendo's games prior to their official release, plays them in unauthorized ways, such as on an emulator or hacked Nintendo Switch console, and streams the leaked games online on platforms such as YouTube and Twitch for the general public to view in violation of Nintendo's exclusive rights. Defendant's distribution of links to repositories of pirated ROMs materially contributes to and induces third parties to infringe upon Nintendo's rights. Defendant's distribution of links to emulators and Nintendo's cryptographic keys (prod.keys), which allows numerous users to circumvent Nintendo's Technological Measures on unauthorized copies of its copyrighted works, constitutes unlawful trafficking in software primarily designed to

circumvent Nintendo's effective Technological Measures in violation of the anti-circumvention and anti-trafficking provisions of the Copyright Act, 17 U.S.C. § 1201 *et seq.* Defendant's use of emulators to decrypt and play Nintendo games, including on unauthorized devices, constitutes unlawful circumvention of Nintendo's effective Technological Measures in violation of those provisions. Defendant's infringement, trafficking and circumvention have directly injured and damaged Nintendo and threaten irreparable injury to Nintendo's intellectual property rights, entitling Plaintiff to the relief sought herein.

## NATURE OF THE ACTION

18.    This is a civil action seeking equitable relief and damages for unlawful reproduction, distribution, and public performance of protected works in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*, and for unlawful circumvention of copyright protection systems (Technological Measures) and unlawful trafficking in circumvention technology in violation of 17 U.S.C. § 1201 *et seq.*

## JURISDICTION AND VENUE

19.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 17 U.S.C. §§ 106, 501, 1201, and 1203.

20.    Defendant is subject to the jurisdiction of this Court pursuant to Federal Rule of Civil Procedure ("Rule") 4(k)(1)(A) because he resides within and is domiciled in this District and will be served with process in this District.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), (c)(2), and/or 28 U.S.C. § 1400(a), because Defendant resides within and is domiciled in this District, and a substantial part of the events giving rise to the claim occurred in this District.

## THE PARTIES

22.    Nintendo of America Inc. is a Washington corporation headquartered in Redmond, Washington.   Nintendo of America Inc. is a wholly-owned subsidiary of Nintendo Co., Ltd., a Japanese company headquartered in Kyoto, Japan.   Nintendo of America Inc. is responsible for the marketing and sale of Nintendo's products, and has exclusive rights for the enforcement of Nintendo's intellectual property rights, in the United States.   Nintendo Co., Ltd. develops, and Nintendo of America Inc. markets and distributes, electronic video game consoles, games, and accessories.

23.    Defendant Jesse Keighin is an individual domiciled and residing in the State of Colorado at all times relevant to this Complaint.   Defendant streams, uploads, and posts on several online platforms including YouTube, Discord, Twitch, TikTok, Trovo, Kick, Vaughn, Dlive, Picarto, Nimo, Facebook, and Loco under the username "Every Game Guru," or variations thereof. Defendant has a history of unlawfully streaming leaked games since at least 2022.   Defendant's channels are primarily based around streaming gameplay of games, including Nintendo's games, frequently prior to their release to the public.   The streams generally consist of lengthy stretches of gameplay, often without commentary by Defendant.   Nintendo has submitted at least 30 takedown notices to various platforms over the last two years regarding Defendant's infringing streams of leaked games and has even directly reached out to Defendant regarding his unlawful acts.   Recently, YouTube demonetized and then deactivated Defendant's account, and other platforms, such as Twitch, likewise disabled Defendant's account(s).   But Defendant continues to stream infringing content on any platform he can find.   In the last couple weeks, he has repeatedly streamed content from Nintendo's upcoming unpublished game *Mario & Luigi: Brothership.* Defendant also traffics in third-party software that circumvents Nintendo's Technological

Measures by linking to Nintendo Switch emulators and prod.keys and has induced and encouraged his viewers to download illegal ROMs.

## FACTUAL BACKGROUND

24.     Nintendo is a company and brand famous throughout the United States and the world, known by consumers of all ages for its video games, video game consoles, and video game characters.

25.     For decades, Nintendo has been a leading developer and producer of video games and video game consoles.  In 1983, Nintendo released the Family Computer in Japan and in 1985, released the Nintendo Entertainment System, or "NES," in the United States, which introduced millions of consumers to now-classic games like *Super Mario Bros.*, *The Legend of Zelda*, and *Donkey Kong*.  The NES console also introduced millions of consumers to some of Nintendo's original and long-lasting characters, including Mario and Luigi, Yoshi, Donkey Kong, Link, and Samus Aran.  Over the ensuing decades, Nintendo followed up the popularity of the NES console with the release of many groundbreaking home video game consoles as well as handheld video game consoles, including the Nintendo Switch.  Since 1983, Nintendo has sold more than 5.8 billion video games and more than 850 million hardware units globally.

26.     Nintendo has built its company through substantial creative and financial investment in the development of new consoles, video games, products, Technological Measures, intellectual property, and marketing.  Nintendo has garnered significant consumer awareness and goodwill through its commitment to developing and delivering innovative, fun, and memorable video game consoles and games.  Nintendo's video games are creative, audiovisual works with detailed stories, characters, and elements that are wholly original to Nintendo and protected by the Copyright Act.  Nintendo and its authorized licensees create and publish many beloved video

games made specifically and exclusively for play on Nintendo's video game consoles including the Nintendo Switch.

27.    In addition to the video games developed and published by Nintendo, Nintendo also allows third-party developers to create their own games for the Nintendo Switch console as licensees.  Third-party games are also covered by copyright, and Nintendo's Technological Measures protect against the access and copying of those games too.

28.    The popularity of Nintendo's video games and video game consoles has made Nintendo the target of intellectual property pirates who benefit from Nintendo's innovation and investment by making unauthorized copies of Nintendo's video games, or by creating (and profiting from) unlawful devices and software, such as emulators, that allow others to play pirated copies of Nintendo's video games, including on non-Nintendo consoles.

29.    Nintendo has expended significant resources to stop the illegal copying, marketing, sale, and distribution of unauthorized copies of Nintendo's video games (or games made by other Nintendo-authorized licensees) designed to be played on Nintendo's video game consoles, and to stop the illegal trafficking in devices and software that allow users to play unauthorized copies of games.  Nintendo's efforts have included the creation and implementation of Technological Measures in Nintendo's video game consoles and video games that protect against unauthorized access to Nintendo's and its licensees' copyrighted works, and that prevent the unauthorized play of pirated Nintendo games.

30.    The release schedule of Nintendo's video games is designed to maximize the enjoyment for its international fanbase.  The premier of each video game is carefully choreographed for months in advance, with strategically planned official announcements and independent, authorized reviews of gameplay.  For each release, global teams coordinate the game's marketing

and distribution to ensure that the millions of excited players get to experience the game for themselves free from spoilers. This generates the maximum excitement across Nintendo's users and leads to the greatest possible consumer awareness and goodwill.

> ### The Technological Measures on the Nintendo Switch and Nintendo Switch Games Protect Nintendo Switch Games Against Piracy.

31.    In March 2017, Nintendo released a new console called the Nintendo Switch, a home video game console that can also be played "on the go." It quickly sold out in stores across the world, and, in the seven years since, has become one of the best-selling video game consoles of all time.

32.    The top five Nintendo-developed games released for the Nintendo Switch alone have sold more than 203 million copies as of June 2024, and individually each title has sold over 28 million copies. These games, as well as dozens of others published by Nintendo, are subject to valid, registered copyrights owned by Nintendo. Nintendo's authorized licensees develop and publish thousands more games on the Nintendo Switch, which are also subject to valid copyrights.

33.    Nintendo allows users either to purchase authorized physical cartridges with games on them which are then inserted into the Nintendo Switch console, or to download digital games from Nintendo's own online store (the Nintendo eShop) directly onto the Nintendo Switch. The Nintendo eShop is the only lawful way to download Nintendo Switch games in digital format. These authorized copies of Nintendo's and its licensees' games are protected by **multiple Technological Measures**, some of which are described herein, each of which in the ordinary course of its operation—*i.e.*, when a user plays a lawfully-purchased copy of a Nintendo Switch game on an authentic unmodified Nintendo Switch console—requires the application of information or a process with Nintendo's authority for the user to be able to access and play the

game, including measures that additionally prevent the games from being copied or distributed without Nintendo's authority.

34.    For example, each game is encrypted.  Nintendo uses industry-standard AES-128 encryption for each of its game files, or "ROMs," which makes the game file useless unless the user possesses the specific cryptographic key to decrypt it, a key created by and known only to Nintendo in the ordinary course of operation.  The key that unlocks a particular game's encryption, (hereafter the "Title Key") is distributed by Nintendo with the game file in encrypted form.  In other words, the key to unlock the game file is itself encrypted with another cryptographic key. Both physical cartridge games and Nintendo eShop games each require complex decryption steps to produce its decrypted Title Key.  The keys used by the console to perform decryption steps are part of a set of secured cryptographic keys on a Nintendo Switch commonly referred to as the "prod.keys."  The Title Key is the final key needed to decrypt the game and play it.  Together, the encryption unlocked by the Title Key and prod.keys, including the secret and proprietary process by which authorized Nintendo games are unlocked by those keys, is referred to herein as the "Game Encryption."

35.    Each authentic unmodified Nintendo Switch console also contains many Technological Measures which, among other things, verify the console's authenticity, as well as prevents unauthorized access to or copying of the console' software, firmware, and data— including prod.keys.  In sum, when a user of an authentic unmodified Nintendo Switch console goes to play an authentic game, the user's Nintendo Switch must decrypt the Game Encryption using Nintendo's proprietary cryptographic keys.  A game can be played on an authentic unmodified Nintendo Switch only if all of the required steps are successful.  The Technological

Measures, including the Game Encryption, protects Nintendo's and its licensees' copyrighted games against unauthorized access and copying.

36.     In their ordinary course of operation, the Technological Measures require the application of information and processes, with the authority of Nintendo, to gain access to Nintendo's or its licensees' copyrighted works, and thus effectively control access to those works and protect rights of the copyright owners of those works.

### Nintendo Switch Emulators

37.     A video game emulator is a piece of software that allows general-purpose computing devices to play video games published only for a specific console.  Two of the most popular video game emulators for Nintendo Switch games are called "Yuzu" and "Ryujinx" and are each compatible with multiple of the major operating systems, including Windows, MacOS, Linux, and Android.  Yuzu and Ryujinx (and other Nintendo Switch emulators) are not compatible with games made for any other console (including games actually designed for Windows, MacOS, Linux, or Android systems).

38.     After downloading and installing an emulator, which Defendant links to, the user is able to use the emulator and its circumvention functionality to play pirated games.  All the user needs to do is supply an unlawfully-obtained copy of the "prod.keys" and an encrypted Nintendo Switch game ROM, both of which Defendant has also linked to.  All three pieces are necessary for pirated game play.  For example, a user could have Nintendo's cryptographic keys and they could have encrypted game ROMs, but they could not play games without an emulator.

39.     The use of an emulator like Yuzu or Ryujinx requires the user to acquire game files either by downloading a pirated ROM online or circumventing a game cartridge or digital download and making at least one unauthorized reproduction.  Repositories of pirated Nintendo

Switch ROMs are unfortunately available online. Websites hosting these repositories collect direct download links for thousands of Nintendo Switch games and *specifically note that the ROMs are compatible with Yuzu and Ryujinx*. Other sites will even package a pirated ROM *with* a copy of the emulator, so that a user can download everything they need to pirate and play the game with one click.

40.     In the ordinary course of operation, after a game is published, users can lawfully purchase authorized physical game cartridges that are inserted into the Nintendo Switch console or download digital games from the Nintendo eShop. Users who have a lawful copy of a Nintendo Switch game only have Nintendo's authorization to play that single copy on an unmodified Nintendo Switch console. Any unauthorized Nintendo video game ROM—*i.e.*, a game file by itself, not secured on a cartridge or within the console—is an unlawful copy. Either a user unlawfully dumped it from a physical cartridge or digital Nintendo eShop game on a hacked Nintendo Switch (*i.e.*, copied the video game ROM off of the cartridge or console memory and onto the user's SD card or computer), or the user downloaded a pirated copy from an online ROM repository. In the case of prerelease games in particular, a user must either obtain an unlawful copy of a physical cartridge or download it from an online repository of pirated ROMs.

41.     Importantly, an unauthorized Nintendo video game ROM is still an *encrypted* game file, protected by the Game Encryption. Emulators allow users to play unauthorized copies of Nintendo Switch games by circumventing the Game Encryption at or immediately before runtime.

42.     Recall that in an authentic Nintendo Switch, games are only accessed and played using a complex set of decryption steps (*i.e.*, the prod.keys are used to decrypt the Title Key, which is used to dynamically decrypt the game and play it). Emulators (unlawfully) perform the same functions when a user attempts to play an unauthorized Nintendo Switch game ROM. Emulators

unlawfully decrypt the ROM's Game Encryption by (1) identifying the encrypted Title Key that accompanies the game file and using keys in the unlawfully obtained prod.keys to decrypt the Title Key, and (2) decrypting the game ROM using the Title Key. Emulators unlawfully decrypt unauthorized copies of both physical cartridge and Nintendo eShop games, which come in two different file types, using slightly different methods. But both methods require cryptographic keys from the prod.keys and result in decryption of an encrypted ROM. Then the unauthorized game ROM is able to be played in an emulator. All of this, of course, is without Nintendo's authorization.

43.    Nintendo does not offer Nintendo Switch games on any other platforms, and so for any user to play a Nintendo Switch game in an emulator they must necessarily make or obtain an infringing copy. As the copyright owner of its creative games, Nintendo has the right to decide whether or when to enter the market of games for platforms other than its own console.

44.    The harm to Nintendo caused by the use, distribution, and proliferation of emulators goes far beyond users making unauthorized copies of games they have lawfully purchased. On information and belief, the vast majority of users, like Defendant, are using emulators to play pirated games. This piracy causes Nintendo tremendous harm, including millions of dollars of monetary harm from lost video game sales both of Nintendo's and its licensees' copyrighted games, and loss of goodwill. Moreover, prerelease piracy in particular causes Nintendo and its fans significant harm by spoiling the surprise and delight ahead of the games release. Nintendo has expended considerable efforts to quell the piracy of its games. For example, in early 2024 Nintendo brought a lawsuit against the company behind the development of the Yuzu emulator, and a court ultimately enjoined the development and distribution of the emulator because it violated the 17 U.S.C. § 1201. *See* Final Judgment & Permanent Injunction, *Nintendo of Am., Inc.*

*v. Tropic Haze LLC*, No. 1:24-cv-00082, Dkt. 11 (D.R.I. 2024). As a result, the lead developer of the Yuzu project took down the website and Patreon and the code was removed from GitHub, where it had been hosted. Ryujinx's code repository was similarly voluntarily removed from GitHub by its creator.

45. This has reduced the availability of Yuzu and Ryujinx but has led to a proliferation of copycats of both, primarily because both projects were open-source—meaning that their entire source code was publicly available for users to fork (*i.e.*, create branched copies of) or otherwise copy. Emulator copycats are copies of that code appearing under a new name, sometimes as literal clones, other times making minor modifications to have the code form a new open-source project. Two currently available copycats of Yuzu include "Suyu" and "Sudachi." As with their parent, these copycats are primarily designed to circumvent Nintendo's Technological Measures.

***Defendant's Infringement of Nintendo's Games Before Their Release***

46. Operating under the screenname "Every Game Guru," Defendant live streams himself playing video games online and posts the videos on several online platforms and websites such as YouTube, Discord, Twitch, TikTok, Trovo, Kick, Vaughn, Dlive, Picarto, Nimo, Facebook, and Loco. He has bragged that Nintendo "can't stop me" because he "stream[s] to 12 different platforms." Defendant also operates a Discord (instant messaging) server where he can instant message his viewers. His online accounts often have text boxes and descriptions advertising that his videos and streams are "EARLY RELEASE" or "FIRST LOOK" games that are otherwise unavailable to the general public, as seen in this screenshot showing him advertising his own stream of prerelease gameplay from an unpublished Nintendo title *Mario & Luigi: Brothership*.



47.    On at least *fifty* occasions in the last two years, Defendant has streamed gameplay footage of pirated copies of at least *ten different* Nintendo games without authorization—all *before* those titles were released to the public.  All of these streams were unauthorized and all compromise Nintendo's legitimate prerelease marketing.  They also promote and encourage downloading of pirated copies of unpublished games.  Defendant's streams often consist merely of him playing Nintendo's leaked games without commentary for extended periods of time.

48.    Set forth below are just some of Defendant's unauthorized public performances of Nintendo's copyrighted works before their release to the public.

49.    For instance, Defendant first streamed a pirated copy of *Mario & Luigi: Brothership* on YouTube and other streaming platforms, including but not limited to loco.gg, on October 22, 2024, sixteen days prior to the official release date slated for November 7, 2024.  He later streamed this game again on at least October 23, October 24, October 25, and October 29.



50.    Based on Defendant's history streaming leaked games, he anticipated that Nintendo would issue a takedown notice under Section 512 of the Copyright Act, so in his streams he told users to go to loco.gg if the stream was taken down.  Sure enough, after Nintendo enforced its rights through various takedown notices, including on YouTube, Defendant continued livestreaming gameplay on Loco as well as other streaming platforms.  In his streams, Defendant also included a QR code (in the bottom left corner of the above screenshot) for his CashApp handle, encouraging his viewers to donate to fund his unlawful streaming.  If a platform suspended Defendant's account, he would create a new account so he could continue to stream on multiple platforms simultaneously.  Defendant also emailed Nintendo stating that he had "a thousand burner channels" and that he "can do this all day."



51.     On October 11, 2024, Defendant streamed a pirated copy of *Super Mario Party Jamboree* on at least Kick.com six days prior to the official release date of October 17, 2024.



52.     Defendant streamed a pirated copy of *The Legends of Zelda: Echoes of Wisdom* on at least YouTube on September 21, 2024, five days prior to the official release date of September 26, 2024.



53.     Defendant streamed a pirated copy of *Paper Mario: The Thousand-Year Door* for the Nintendo Switch on at least YouTube on May 21, 2024, two days prior to its official release date on May 23, 2024.



54.     Defendant streamed a pirated copy of *Mario vs. Donkey Kong* for the Nintendo Switch on at least YouTube on February 15, 2024, one day prior to its official release date on February 16, 2024.



55.     Defendant streamed a pirated copy of *Super Mario RPG* for the Nintendo Switch on at least YouTube on November 10, 2023, seven days prior to its official release date on November 17, 2023.



56.     Defendant streamed a pirated copy of *Super Mario Bros. Wonder* on at least YouTube on October 15, 2023, five days prior to its official release date on October 20, 2023.



57.     Defendant streamed a pirated copy of *Pikmin 4* on at least YouTube on July 19, 2023, two days prior to its official release date on July 21, 2023, commenting on one of his YouTube videos that "I got two copyright strikes streaming it early [laughing emoji] Gotta play it safe for 90 days [grinning emoji]"



58.     Defendant streamed a pirated copy of *Splatoon 3* on at least YouTube on September 6, 2022, three days prior to its official release date on September 9, 2022.



59.    Defendant streamed a pirated copy of *Mario Strikers: Battle League* on at least YouTube on June 8, 2022, two days prior to its official release date on June 10, 2022.



60.    Generally, for each of the above games Defendant streamed pirated gameplay footage on more than one occasion prior to the game's release date and often on multiple platforms.  Each of the above titles is a copyrighted work registered to Nintendo as shown here:

| Title | Copyright Registration No. |
| --- | --- |
| *Mario & Luigi Brothership* | PAu 4-241-342 |
| *Super Mario Party Jamboree* | PA 2-498-170 |
| *Super Mario RPG* | PA-2-452-197 |
| *The Legend of Zelda: Echoes of Wisdom* | PA-2-491-816 |
| *Paper Mario: The Thousand Year Door* | PA-1-264-832 |
| *Mario vs Donkey Kong* | PA-2-468-279 |
| *Super Mario Bros. Wonder* | PA-2-435-940 |
| *Pikmin 4* | PA-2-428-121 |
| *Splatoon 3* | PA-2-369-709 |
| *Mario Strikers: Battle League* | PA-2-412-576 |

61.     Streaming an audiovisual work is a public performance of that work.  Nintendo has the exclusive right to publicly perform its works, and Defendant violated Nintendo's rights by streaming each of these works to the public without Nintendo's authorization—violations that are especially egregious and harmful considering the content was unpublished when first streamed. After Defendant unlawfully streamed each of these leaked games on one or more occasions, he would upload or re-upload[4] the recorded stream to certain platforms so that his viewers and the public could continue to access his unauthorized public performances, even after the publication of the games.  The fact that these were all leaked games underscores that, no matter how he acquired the game, it was illegal, because any copy of an unpublished game must have been obtained unlawfully.  In addition, on information and belief, Defendant made at least one unauthorized reproduction of the leaked games, such as by downloading them illegally from a repository of pirated ROMs to play in an emulator and/or on an unlawfully modified Nintendo Switch console.

62.     In addition to his unlawful streams, Defendant has provided his viewers with the means to obtain their own pirated copies.  Specifically, he has linked to repositories of Nintendo ROMs (*i.e.*, game files) for many of Nintendo's consoles, including Nintendo Switch-specific pirated ROMs, on various platforms such as Discord and YouTube.  By doing so, as seen in this exemplary screenshot, he is inducing and materially contributing to those viewers downloading pirated games.

---

[4] In multiple instances, Defendant re-uploaded recorded streams that had been removed from a platform due to a valid copyright notice prior to the games' publication.



***Defendant's Circumvention of Nintendo's Technological Measures, Including Using Emulators and Trafficking in Circumvention Devices Including Emulators and Cryptographic Keys***

63.     Defendant has also made clear that he is streaming his illegally obtained games while playing on a Nintendo Switch emulator, such as Ryujinx or Yuzu, or on a hacked Nintendo Switch. Therefore, by definition and for the reasons set forth above (*see supra* ¶¶ 30–62), he has admitted that he has circumvented the Technological Measures on Nintendo's games including the Game Encryption.

64.     For instance, in a copyright counter notification to YouTube in an attempt to have his unlawful streams of Nintendo's copyrighted works reinstated,[5] Defendant admitted that he streamed his game on non-Nintendo hardware using an emulator .

---

[5] The subject of a 17 U.S.C. § 512 takedown notice may submit a "counternotice" to the platform operator objecting to the takedown and swearing under oath that their use is non-infringing and lawful.



65.     Aside from openly admitting he has "tested" games in emulators (which he has done), his streams reveal that fact too.  For instance, emulators will often show details regarding the system it is running on such as the type of GPU, or statistics about performance, such as the game's framerate.  In the below screenshot of one of Defendant's streams of *The Legends of Zelda: Echoes of Wisdom*, these statistics can be seen in the upper lefthand corner, which are not present in the original game.



66.     And in the below screenshot of Defendant's prerelease stream of *Super Mario Party Jamboree*, similar performance details can be seen in banners at the top and bottom.



67.     Furthermore, Defendant's emulator crashed once while he was streaming *Super Mario Party Jamboree*, clearly showing that he was playing on an emulator as opposed to a

Nintendo Switch console.



68.     As discussed above, because all Nintendo Switch games are encrypted, all Nintendo Switch emulators circumvent Nintendo's Technological Measures, as recognized by one U.S. court that enjoined the distribution of a Nintendo Switch emulator.

69.     On information and belief, Defendant has played and streamed each of the pirated prerelease games discussed above in an emulator or on a hacked Nintendo Switch. In addition to engaging in willful copyright infringement, Defendant is directly circumventing Nintendo's Technological Measures on those games at and during runtime, at minimum when using emulators to play the games.

70.     Defendant has also publicly posted and shared links to Ryujinx, Yuzu, and other

emulator copycats, as can be seen in the screenshot below.



71.    As can be seen in the screenshot, Defendant has linked to Nintendo Switch decryption keys (so-called prod.keys and Title Keys) and has threatened more links to come. In an email to Nintendo on October 17, 2024, he wrote that he "will actively help people find newer

and updated copies of Ryujinx and Yuzu" as well as helping people play Nintendo Switch games "on their PC with no need to buy [Nintendo's] hardware."

72.    Linking to circumvention software is trafficking in that software. By linking to the emulators Ryujinx, Yuzu, Suyu, and Sudachi, Defendant is providing those emulators to the public, violating Nintendo's rights under 17 U.S.C. § 1201.

73.    Distributing decryption keys is likewise unlawful under 17 U.S.C. § 1201, and Defendant has trafficked in the keys by linking to them.

## COUNT ONE

### (Unauthorized Public Performance and Reproduction of Protected Works in Violation of 17 U.S.C. §§ 106(1), 106(4), 501(a))

74.    Plaintiff repeats and realleges every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

75.    Section 106 of the Copyright Act, 17 U.S.C. § 106, provides, in pertinent part, that the owner of a copyright under the Copyright Act has the exclusive right to reproduce and publicly perform its audiovisual works.

76.    Plaintiff owns valid, registered copyrights in numerous games for the Nintendo Switch.  In particular, Nintendo holds copyrights in *Mario & Luigi Brothership*,[6] *Super Mario Party Jamboree*,[7] *Super Mario RPG*,[8] *The Legend of Zelda: Echoes of Wisdom*,[9] *Paper Mario:*

---

[6] Copyright Reg. No. PAu 4-241-342.
[7] Copyright Reg. No. PA 2-498-170.
[8] Copyright Reg. No. PA-2-452-197
[9] Copyright Reg. No. PA-2-491-816

*The Thousand Year Door*,[10] *Mario vs. Donkey Kong*,[11] *Super Mario Bros. Wonder*,[12] *Pikmin 4*,[13] *Splatoon 3*,[14] and *Mario Strikers: Battle League*.[15]

77.     Defendant publicly streamed each of these games without authorization across numerous online platforms, prior to their public release, and often later uploaded copies of the same unauthorized gameplay.  Each such public performance constitutes a violation of 17 U.S.C. § 501(a) for which Plaintiff is entitled damages under 17 U.S.C. §§ 504 and 505 and injunctive relief under 17 U.S.C. §§ 502 and 503.

78.     Each of these games were leaked games that were not yet publicly available and therefore could not have been legally acquired (let alone streamed/performed publicly).  Moreover, any ROM for a Nintendo Switch game in Defendant's possession, regardless of its release status (but made even more harmful if a leaked game), necessarily required an unauthorized reproduction of the game in violation of 17 U.S.C. § 501(a) for which Plaintiff is entitled damages under 17 U.S.C. §§ 504 and 505 and injunctive relief under 17 U.S.C. §§ 502 and 503.  *See, e.g.*, *supra* ¶ 60; Exhibit A.

79.     Upon information and belief, Plaintiff expects discovery to reveal that more of its copyrighted games have been infringed.  For instance, on information and belief, Defendant has downloaded game ROMs online from pirate communities or the pirate websites that he has referred other users to.  Any such reproductions would be additional infringements.

---

[10] Copyright Reg. No. PA-1-264-832
[11] Copyright Reg. No. PA-2-468-279
[12] Copyright Reg. No. PA-2-435-940
[13] Copyright Reg. No. PA-2-428-121
[14] Copyright Reg. No. PA-2-369-709
[15] Copyright Reg. No. PA-2-412-576

80. Nintendo has not licensed its rights to Defendant or otherwise provided authorization for Defendant to exercise any of Nintendo's exclusive rights in its copyrighted games.

81. Defendant's acts are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Nintendo. In fact, Defendant posted on his Facebook account that he "can't wait for more new games to stream and give away for free." Defendant is liable for each of his acts as set forth herein.

82. As a direct and proximate result of Defendant's violations of 17 U.S.C. § 501(a)—including his prerelease public performances and continuing infringement by hosting copies of the streams after publication of the works—Plaintiff is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c)(2), in the amount of $150,000 with respect to each copyrighted work or such other amounts as may be proper under 17 U.S.C. § 504(c). In the alternative, pursuant to 17 U.S.C. § 504(b), Plaintiff is entitled to its actual damages, as well as to Defendant's profits from these violations, in amounts to be proven at trial.

83. Plaintiff is entitled to its full costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

84. Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Nintendo great and irreparable injury for which there is no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to permanent injunctive relief prohibiting Defendant from engaging in further acts of infringement of Nintendo's protected works.

## COUNT TWO

### (Contributory and Inducement Liability For Unauthorized Reproduction of Protected Works in Violation of 17 U.S.C. §§ 106(1), 501(a))

85.    Plaintiff repeats and realleges every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

86.    Section 106 of the Copyright Act, 17 U.S.C. § 106, provides, in pertinent part, that the owner of the copyright under the Copyright Act has exclusive right to reproduce and distribute its audiovisual works.

87.    Plaintiff owns valid, registered copyrights in numerous games for the Nintendo Switch, including the games discussed *supra*, Paragraph 76.

88.    Defendant has shared links to online repositories of ROMs, including on his YouTube channel and Discord server, and he has shared links to emulators. The online repositories consist solely of content that infringes Nintendo's rights. He knows this, boasting in an email to Nintendo that he "will actively help people find newer and updated copies of Ryujinx and Yuzu (Yes, they're still being developed underground) and sharing ALL of the ROM resources including torrents, and FTP servers, as well as helping people to play at 4K with Ray Tracing on their PC with no need to buy your hardware." By linking to and actively promoting such repositories, Defendant is materially contributing to and inducing further infringement by reproduction and distribution of the games in those repositories. Unauthorized copies of Nintendo games' audiovisual content are made dynamically during the use of emulators such as Yuzu and Ryujinx, including as the game content is decrypted. Defendant induces that infringement because Defendant has engaged in purposeful conduct that encourages and is intended to encourage those users to make infringing copies of Nintendo's copyrighted games on unauthorized platforms and to play those games on such platforms.

89.     As such, Defendant is secondarily liable for each act of infringement (unauthorized reproduction, distribution, or public performance) performed by his viewers.

90.     Each such act of infringement constitutes a violation of 17 U.S.C. § 501(a) for which Plaintiff is entitled to damages under 17 U.S.C. § 504 and injunctive relief under 17 U.S.C. § 502.

91.     Defendant's acts are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Nintendo.

92.     As a direct and proximate result of Defendant's violations of 17 U.S.C. § 501(a), Plaintiff is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c)(2), in the amount of $150,000 with respect to each copyrighted work, or such other amounts as may be proper under 17 U.S.C. § 504(c).  In the alternative, pursuant to 17 U.S.C. § 504(b), Plaintiff is entitled to its actual damages, as well as to Defendant's profits from these violations, in amounts to be proven at trial.

93.     Plaintiff is entitled to its full costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

94.     Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Nintendo great and irreparable injury for which there is no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to permanent injunctive relief prohibiting Defendant from engaging in further acts of contributing to or inducing others to reproduce Nintendo's protected works.

## COUNT THREE

### (Circumvention of Technological Measures in Violation of 17 U.S.C. § 1201(a)(1))

95.     Plaintiff repeats and realleges every allegation contained in paragraphs 1 through 94 as if fully set forth herein.

96.     Section 1201(a)(1)(A) of the Copyright Act, 17 U.S.C. § 1201(a)(1), in a general sense, prohibits circumvention of a technological measure that effectively controls access to a work protected by the Copyright Act.

97.     Nintendo's Technological Measures effectively control access to works protected by the Copyright Act, including at minimum the copyrighted works discussed herein.

98.     The Defendant, at a minimum, loaded unauthorized copies of games into Ryujinx, Yuzu, or another emulator and streamed them.  Each of those steps requires circumvention of one or more of the Technological Measures.  Defendant circumvented Nintendo's Game Encryption for each game he played in an emulator.

99.     Each act of circumvention constitutes a violation of 17 U.S.C. § 1201 for which Plaintiff is entitled to damages under 17 U.S.C. § 1203(c), and injunctive relief under § 1203(b)(1).

100.     Defendant and his agents' acts are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.  Defendant is liable for each of his agents' illegal acts as set forth herein.

101.     As a direct and proximate result of Defendant's violations of 17 U.S.C. § 1201, Plaintiff is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(3)(A), in the amount of $2,500 with respect to each act of circumvention, or such other amounts as may be proper under 17 U.S.C. § 1201(c).  In the alternative, pursuant to 17 U.S.C. § 1201(c)(2), Plaintiff

is entitled to its actual damages, as well as to Defendant's profits from these violations, in amounts to be proven at trial.

102.    Plaintiff is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 1203(b).

103.    Defendant and his agents' conduct has caused and, unless enjoined by this Court, will continue to cause Nintendo great and irreparable injury for which there is no adequate remedy at law.   Pursuant to 17 U.S.C. § 1203(b)(1), Plaintiff is entitled to permanent injunctive relief prohibiting Defendant from engaging in further acts of circumvention through the use of emulators since emulators decrypt Nintendo's games.

## COUNT FOUR

### (Trafficking in Circumvention Technology in Violation of 17 U.S.C. § 1201(a)(2))

104.    Plaintiff repeats and realleges every allegation contained in paragraphs 1 through 103 as if fully set forth herein.

105.    Section 1201(a)(2) of the Copyright Act, 17 U.S.C. § 1201(a)(2), prohibits, in a general sense, the trafficking in technology primarily designed to circumvent technological measures that effectively control access to copyrighted works.  The statute provides, in pertinent part, that "[n]o person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act];

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under [the Copyright Act]; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act]."

106. The Technological Measures effectively control access to works protected by the Copyright Act, including Nintendo Switch games in which Nintendo owns or exclusively controls copyrights.

107. As discussed *supra*, the Technological Measures—including the Game Encryption—require, in the ordinary course of their operation, the application of information, or a process or a treatment, with Nintendo's authority, to gain access to Nintendo Switch games.

108. Yuzu, Ryujinx, and other Nintendo Switch emulators, including but not limited to the copycat emulators Suyu and Sudachi, circumvent the Game Encryption on Nintendo Switch games including by decrypting their many layers of encryption, thereby enabling access to and play of those games on unlicensed platforms. Nintendo Switch emulators as described herein are thus both primarily designed to circumvent an effective technological measure and have only limited commercially significant purpose or use other than to circumvent an effective technological measure.

109. Defendant knows that emulators are designed, implemented, and used to circumvent the Game Encryption. In fact, as noted above, he boasted in an email to Nintendo after certain emulators had been found to be unlawful by a U.S. federal court that he "will actively help people find newer and updated copies of Ryujinx and Yuzu . . . and sharing ALL of the ROM

resources including torrents, and FTP servers, as well as helping people to play . . . on their PC with no need to buy your hardware."  His conduct of sharing links to Yuzu, Ryujinx, and other emulators constitutes marketing with knowledge for emulators' use in circumventing an effective technological measure.

110.    Through YouTube, Discord, and other channels of distribution, Defendant offers to the public, provides, and otherwise traffics in Ryujinx, Yuzu, and other emulators in violation of 17 U.S.C. § 1201(a)(2)(A), (B), and/or (C).

111.    Each offering to the public, provision, or other act of trafficking in Nintendo Switch emulator software repositories and other circumvention devices constitute a violation of 17 U.S.C. § 1201 for which Plaintiff is entitled to damages under 17 U.S.C. § 1203(c), and injunctive relief under § 1203(b)(1).

112.    Defendant also offers to the public, provides, and otherwise traffics in unauthorized copies of games and keys that circumvent the Technological Measures, by providing direct links to such software on other websites.  This includes Nintendo's cryptographic keys (prod.keys), which are primarily designed to circumvent the Technological Measures.  Each offering to the public, provision, or other act of trafficking in links to this and other circumvention software constitutes a violation of 17 U.S.C. § 1201 for which Nintendo is entitled to damages under 17 U.S.C. § 1203(c), and injunctive relief under § 1203(b)(1).

113.    Defendant's acts are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.  He stated on Facebook that he "can't wait for more new games to stream and give away for free."

114.    As a direct and proximate result of Defendant's violations of 17 U.S.C. § 1201, Plaintiff is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(3)(A), in

the amount of $2,500 with respect to each act of offering to the public, provision, or otherwise trafficking in circumvention technology, or such other amounts as may be proper under 17 U.S.C. § 1201(c). In the alternative, pursuant to 17 U.S.C. § 1201(c)(2), Plaintiff is entitled to its actual damages, as well as to Defendant's profits from these violations, in amounts to be proven at trial.

115.    Plaintiff is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 1203(b).

116.    Defendant's conduct has caused and, unless enjoined by this Court, will continue to cause Nintendo great and irreparable injury for which there is no adequate remedy at law. Pursuant to 17 U.S.C. § 1203(b)(1), Plaintiff is entitled to permanent injunctive relief prohibiting Defendant from engaging in further acts of offering to the public, providing, or otherwise trafficking in emulators or other circumvention software.

## COUNT FIVE

### (Trafficking in Circumvention Technology in Violation of 17 U.S.C. § 1201(b)(1))

117.    Plaintiff repeats and realleges every allegation contained in paragraphs 1 through 116 as if fully set forth herein.

118.    Section 1201(b) of the Copyright Act, 17 U.S.C. § 1201(b), in a general sense, prohibits the trafficking in devices that are primarily designed to circumvent technological measures that protect against the violation of rights protected under the Copyright Act. The statute provides, in pertinent part, that "[n]o person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

> (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under [the Copyright Act] in a work or a portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under [the Copyright Act] in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under [the Copyright Act] in a work or a portion thereof."

119.    The Technological Measures effectively control access to works protected by the Copyright Act. These copyrighted works include Nintendo Switch games in which Nintendo owns or exclusively controls copyrights.

120.    As discussed above, Plaintiff's Technological Measures—including the Game Encryption—in the ordinary course of their operation, prevent, restrict, or otherwise limit the exercise of a right of a copyright owner under the Copyright Act, by controlling or managing whether one can *copy* Nintendo's copyrighted works, *distribute* unauthorized copies of Nintendo's copyrighted works, and *play* (publicly perform) unauthorized copies of Nintendo's copyrighted works.

121.    Yuzu, Ryujinx, and other emulators, including but not limited to the copycat emulators Suyu and Sudachi, circumvent the Game Encryption on Nintendo Switch games, including by decrypting their many layers of encryption, thereby enabling play of those games on unlicensed platforms. Nintendo Switch emulators as described herein are thus both primarily designed to circumvent an effective technological measure and have only limited commercially significant purpose or use other than to circumvent an effective technological measure.

122.    Defendant knows that emulators are designed, implemented, and used to circumvent the Game Encryption to permit the reproduction and play of Nintendo Switch games, and his conduct sharing links to Yuzu, Ryujinx, and other emulators thus constitutes marketing with knowledge for emulators' use in circumventing an effective technological measure.

123.    Through YouTube, Discord, and other channels of distribution, Defendant offers to the public, provides, and otherwise traffics in Ryujinx, Yuzu, and other emulators in violation of 17 U.S.C. § 1201(b)(1)(A), (B), and/or (C).

124.    Each offering to the public, provision, or other act of trafficking in emulator software repositories and other circumvention devices constitute a violation of 17 U.S.C. § 1201 for which Plaintiff is entitled to damages under 17 U.S.C. § 1203(c), and injunctive relief under § 1203(b)(1).

125.    Defendant also offers to the public, provides, and otherwise traffics in software and cryptographic keys that circumvent the Technological Measures by providing direct links to such circumvention software on other websites, which facilitates the unauthorized reproduction and play of Nintendo games.  This includes Nintendo's cryptographic keys (prod.keys).  Linking to these software and keys similarly violates § 1201(b)(1) because they are primarily designed to circumvent the Technological Measures.  Each offering to the public, provision, or other act of trafficking in links to these and other circumvention software constitutes a violation of 17 U.S.C. § 1201 for which Nintendo is entitled to damages under 17 U.S.C. § 1203(c), and injunctive relief under § 1203(b)(1).

126.    Defendant's acts are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

127.    As a direct and proximate result of Defendant's violations of 17 U.S.C. § 1201, Plaintiff is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(3)(A), in the amount of $2,500 with respect to each act of offering to the public, provision, or otherwise trafficking in circumvention technology, or such other amounts as may be proper under 17 U.S.C. § 1201(c). In the alternative, pursuant to 17 U.S.C. § 1201(c)(2), Plaintiff is entitled to its actual damages, as well as to Defendant's profits from these violations, in amounts to be proven at trial.

128.    Plaintiff is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 1203(b).

129.    Defendant's conduct has caused and, unless enjoined by this Court, will continue to cause Nintendo great and irreparable injury for which there is no adequate remedy at law. Pursuant to 17 U.S.C. § 1203(b)(1), Plaintiff is entitled to permanent injunctive relief prohibiting Defendant from engaging in further acts of offering to the public, providing, or otherwise trafficking in emulators or other circumvention software.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.    For a declaration that Defendant's activities as alleged herein constitute violations of 17 U.S.C. §§ 106 and 501 and 17 U.S.C. § 1201.

2.    For such equitable relief under Titles 17 and 28 of the United States Code, and this Court's inherent equitable powers, as is necessary to prevent or restrain Defendant's further violations of 17 U.S.C. §§ 106 and 501 and 17 U.S.C. § 1201, including a permanent injunction prohibiting Defendant and his attorneys, and all third parties in active concert or participation with any of them, from: (a) publicly performing Nintendo's copyrighted games via streaming or encouraging or facilitating any other individual to violate Nintendo's exclusive rights to publicly

perform its works; (b) otherwise infringing, or causing, enabling, facilitating, encouraging, promoting, and inducing or participating in the infringement of, any of Nintendo's works protected by the Copyright Act, whether now in existence or hereafter created; (c) offering to the public, providing, or otherwise trafficking in Yuzu, Ryujinx, Suyu, Sudachi, or any other emulators, cryptographic keys, or any other circumvention devices or software that target Nintendo, Nintendo's consoles, or Nintendo's copyrighted works; (d) enjoining Defendant and all third parties with notice of the order from supporting or facilitating access to any or all domain names, URLs, websites, chatrooms, and other social media websites or applications through which Defendant traffics in ROMs or in circumvention devices that threaten Plaintiff's Technological Measures or which infringe Plaintiff's rights under the Copyright Act; and (e) prohibiting Defendant from engaging in any other violation of the Copyright Act, or any other federal or state law, as respects Nintendo.

3.      For entry of an order, pursuant to 17 U.S.C. §§ 502, 1203, 28 U.S.C. § 1651(a), and this Court's inherent equitable powers, requiring Defendant and his attorneys, and all third parties in active concert or participation with any of them: to take down and remove any streams and videos that infringe on Nintendo's copyrights on every website and platform where Defendant has an account, including, but not limited to, YouTube, Discord, Twitch, TikTok, Trovo, Kick, Vaughn, Dlive, Picarto, Nimo, Facebook, and Loco.

4.      For entry of an order, pursuant to 17 U.S.C. §§ 503 and 1203, providing for the seizure, impoundment, and destruction of all copies of emulators, or other devices or software that threaten Plaintiff's Technological Measures, and all other electronic material or physical devices within Defendant's custody, possession, or control—including any hard drives or other electronic storage devices containing such material—that violate Nintendo's rights under the Copyright Act.

5.     For entry of an order requiring Defendant, within thirty (30) days after service of the judgment with notice of entry thereof upon it, to file with the Court and serve upon Nintendo a written report under oath setting forth in detail the manner in which Defendant has complied with Paragraphs 2, 3, and 4 of this Prayer for Relief, *supra*.

6.     For an award of statutory damages pursuant to 17 U.S.C. §§ 504 and 1203(c), in the amount of $150,000 per violation of 17 U.S.C. §§ 106 and 501, arising from Defendant's willful violations of Nintendo's exclusive rights under the Copyright Act, and $2,500 per violation of 17 U.S.C. § 1201, arising from Defendant's willful violations of the anti-circumvention and anti-trafficking provisions of the Copyright Act.   In the alternative, pursuant to 17 U.S.C. § 1203(c)(3)(B) and 17 U.S.C. § 504(b), Plaintiff may elect to receive actual damages as well as Defendant's profits from his violations of 17 U.S.C. § 1201 and 17 U.S.C. §§ 106 and 501, in amounts to be proven at trial.

7.     For an accounting, the imposition of a constructive trust, restitution of Defendant's unlawful proceeds from his violations of 17 U.S.C. § 1201 and 17 U.S.C. §§ 106 and 501, and damages according to proof.

8.     For Plaintiff's costs and reasonable attorneys' fees, pursuant to 17 U.S.C. § 1203(b) and 17 U.S.C. § 505.

9.     For pre-judgment and post-judgment interest; and

10.    For such other relief as the Court may deem just and proper.

Plaintiff hereby demands a trial by jury.

DATED this 6th day of November, 2024.


Respectfully submitted,

**JENNER & BLOCK LLP**


  */s/ Alison I. Stein*
 Alison I. Stein (N.Y. Bar. No. 4787230)*
 Cayman C. Mitchell (N.Y. Bar No. 5978812)*
 1155 Avenue of the Americas
 New York, NY 10036
 Telephone: (212) 891-1600
 Facsimile: (212) 891-1699
 astein@jenner.com
 cmitchell@jenner.com

 Gail H. Morse (Colorado Bar No. 023813)*
 353 N. Clark Street
 Chicago, IL 60654
 Telephone: (312) 222-9350
 Facsimile: (312) 527-0484
 gmorse@jenner.com

 *Admitted in D. Colorado


 *Attorneys for Plaintiff Nintendo of America Inc.*