# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-03101-GPG-STV

NINTENDO OF AMERICA INC.,

    Plaintiff,

v.

JESSE KEIGHIN, individually,

    Defendant.

---

**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

---

This Court entered default against Defendant on March 26, 2025. Clerk's Entry of Default, Dkt. 29. Pursuant to Federal Rule of Civil Procedure ("Rule") 55(b)(2), Plaintiff Nintendo of America Inc. ("Nintendo") now moves for default judgment against Defendant Jesse Keighin and for a permanent injunction restraining Defendant from further unlawful conduct against Nintendo.[1]

I.   **Background.**[2]

A. **Nintendo, Its Copyrighted Works, and Its TPMs.**

Nintendo is a company and brand famous throughout the United States and the world, known by consumers of all ages for its fun and innovative video games, video game consoles—including one of the best-selling consoles, the Nintendo Switch—and its beloved video game characters. Compl. ¶¶ 24–26. Nintendo authors and releases award-winning video games that can be played only on the Nintendo Switch. *Id*. ¶¶ 26–27. The release schedule of Nintendo's video games is carefully choreographed—*e.g.*, strategically-planned announcements and independent, authorized reviews of gameplay—to maximize enjoyment for its international fanbase and to ensure that millions of excited players get to experience the game for themselves free from spoilers. *Id*. ¶ 30. This also leads to the greatest possible consumer awareness and goodwill. *Id*.

The popularity of Nintendo's video games and consoles has made Nintendo the target of intellectual property pirates who benefit from Nintendo's innovation and investment by making unauthorized copies of Nintendo video games, or by sharing software or devices that circumvent technological protection measures on Nintendo consoles and games so that others can copy, distribute, and play pirated copies of Nintendo video games for free. *Id*. ¶¶ 28–29. Nintendo has expended significant resources to halt the illegal copying, marketing, sale, and distribution of

---

[1] Because Defendant has not appeared, Nintendo was unable to confer with him about this motion.
[2] On a default judgment motion, the Court accepts the complaint's well-pleaded factual allegations as true. *Jones v. Marquis Props., LLC*, 212 F. Supp. 3d 1010, 1015 (D. Colo. 2016); *Equal Emp. Opportunity Comm'n v. Roark-Whitten Hosp. 2, LP*, 28 F.4th 136, 157 (10th Cir. 2022).

Nintendo video games, including through its implementation of technological protection measures in Nintendo Switch consoles and games that prevent unauthorized access to, and copying of, Nintendo's copyrighted works (the "TPMs"). *Id*. ¶¶ 29, 33–36. These TPMs include encryption on Nintendo's games, which can be unlocked only by Nintendo's proprietary cryptographic keys (a.k.a. "prod.keys") that are secured on Nintendo's console (the "Game Encryption"). *Id*. ¶ 34.

### B. Nintendo Switch Emulators & Repositories of Pirated ROMs.

A video game emulator is a piece of software that allows general-purpose computing devices to play video games published only for a specific console. *Id.* ¶ 37. Popular Nintendo Switch emulators have included "Yuzu" and "Ryujinx." *Id.* Nintendo Switch emulators operate by circumventing the TPMs on Nintendo Switch games—all of which are encrypted, *id.* ¶ 41—to allow for the play of those encrypted games on devices other than a Nintendo Switch. *Id.* ¶¶ 38–42. Because Nintendo Switch emulators allow users to do this without authorization from Nintendo, they facilitate piracy on a massive scale. *Id.* ¶ 44.

A user needs three things to play pirated video games in a Nintendo Switch emulator: the emulator, an unauthorized copy of a Nintendo Switch game (a.k.a. a "ROM"), and prod.keys. *Id.* ¶ 38. Defendant links to and thus distributes all three. *Infra* § I.C.2; Compl. ¶¶ 13, 17, 38.

Unauthorized game files can be acquired either by downloading a pirated ROM online or circumventing a game cartridge or digital download and extracting the game file. *Id.* ¶ 39. Repositories of thousands of pirated Nintendo Switch ROMs are unfortunately available online. *Id.* Similarly, a user may acquire prod.keys either by downloading a pirated copy online, or by circumventing their Nintendo Switch console's TPMs. *Id.* ¶ 6 & n.3. After downloading and installing an emulator, and obtaining prod.keys and a game, a user can use the emulator's circumvention functionality to decrypt and play encrypted video games for free. *Id.* ¶¶ 38, 40, 42.

Multiple U.S. federal courts have entered judgments providing that trafficking in devices that circumvent Nintendo's TPMs, including trafficking in emulators, violates § 1201 of the Copyright Act. *See Nintendo of America Inc. v. Tropic Haze LLC*, No. 1:24-cv-00082, Dkt. 11 (D.R.I. 2024) (enjoining distribution of Nintendo Switch emulator Yuzu under § 1201); Compl. ¶ 11 (collecting cases enjoining distribution of circumvention devices and software).

### C. Defendant's Violations of the Copyright Act.

#### 1. Defendant's Infringement of Nintendo's Video Games Before Their Release.

Defendant Jesse Keighin has streamed pirated copies of Nintendo's copyrighted video games for multiple years on several online platforms—including YouTube—usually under the username (pseudonym) "Every Game Guru" or variations thereof. Compl. ¶¶ 2, 46. His streams are often of games unavailable to the general public tagged as "EARLY RELEASE" or "FIRST LOOK." *Id*. ¶¶ 46. At least *fifty* times in the last two years, Defendant streamed gameplay of pirated copies of at least *ten different* Nintendo games—all *before* those titles were released. *Id.* ¶ 47. All of these streams were unauthorized and compromised Nintendo's legitimate prerelease marketing. *Id. E.g.*, Defendant streamed a pirated copy of *Mario & Luigi: Brothership* on YouTube and other streaming platforms on Oct. 22, 2024, *16 days prior to the official release*, titling his stream as "EARLY RELEASE." *Id.* ¶ 49. He streamed this game again on Oct. 23, 24, 25, & 29. *Id.*

Defendant streamed pirated copies of nine other of Nintendo's copyrighted video games prior to their release. *Id.* ¶¶ 51–59. Nintendo owns valid, registered copyrights in each. *Id.* ¶ 60; Ex. A. Each of Defendant's streams involves not only an unauthorized public performance (the stream itself), but also at least one unauthorized reproduction of the streamed game, because commercial, authorized copies were unavailable at the time of his streams.[3]

---

[3] *Any* prerelease gameplay involves at minimum making an unauthorized copy into RAM. *See Grady v. Iacullo*, No. 13-CV-00624-RM-KMT, 2016 WL 1559134, at *5 (D. Colo. Apr. 18, 2016)

3

By streaming games prior to their publication, Defendant normalizes and encourages prerelease piracy, signaling to viewers that they too should pirate and play the game *now*, without waiting for its release or paying for it. Compl. ¶ 5. And prerelease piracy harms law-abiding Nintendo customers who may have spoilers from Defendant's steams ruin their own surprise and delight in experiencing the game. *Id.* Defendant has also distributed the means for users to obtain their own pirated copies of games by linking to unauthorized repositories of ROMs, including pirated Nintendo Switch ROMs, on various platforms such as Discord and YouTube. *Id.* ¶ 62.

### 2. Defendant's Circumvention of Nintendo's TPMs and Trafficking in Circumvention Technology.

Section 1201 of Title 17 prohibits the circumvention of technological measures that protect copyrighted works, as well as trafficking in technology that is primarily designed to circumvent such measures. Defendant violated the prohibitions in § 1201 in three ways.

First, Defendant circumvented the encryption on each of the ten games he streamed. Compl. ¶ 63. All Nintendo Switch games (even pirated ones) are encrypted. *Id.* ¶ 41. In the ordinary course, a Nintendo Switch console running a lawfully-purchased game will decrypt that game and permit the user to play the game. An ordinary Nintendo Switch console will *not*, however, allow a user to decrypt, access, or play a pirated copy of a game. To do that, the user must either use an emulator, such as Ryujinx or Yuzu, running on a PC, or an unauthorized operating system installed on a hacked Nintendo Switch. *Id.* ¶¶ 63. Either an emulator or a hacked Nintendo Switch can be used to decrypt a Nintendo Switch game without authorization. *Id.* Here, Defendant often used an emulator but also used a hacked Nintendo Switch, demonstrating that he decrypted and accessed without authorization the prerelease games he streamed. *Id.* ¶¶ 61, 63–69.

---

(transfer of a copyrighted work into RAM "create[s] a copy under the Copyright Act"). And when Defendant played on an emulator, he made at least one other unauthorized copy by downloading a pirated copy from the internet or extracting a copy of the game file from a stolen cartridge.

4

Indeed, Defendant admitted he streamed at least one game using an emulator. *Id.* ¶ 64. And certain of Defendant's streams show system details overlayed on gameplay, which is a feature of emulators but not present when playing a game on a Nintendo Switch. *Id.* ¶¶ 65–67. As discussed above, all Nintendo Switch games are encrypted so all Nintendo Switch emulators circumvent Nintendo's TPMs, as do unauthorized operating systems running on hacked consoles. *Id.* ¶ 68. Defendant has thus circumvented the TPMs on all ten video games he streamed. *Id.* ¶¶ 63, 68.

<u>Second</u>, Defendant has publicly shared links to the Nintendo Switch emulators Ryujinx, Yuzu, Suyu, and Sudachi on social media. *Id.* ¶ 70. Each such link is trafficking in a circumvention device. *Id.* ¶ 72. And in an email to Nintendo on Oct. 17, 2024, Defendant wrote that he "will actively help people find newer and updated copies of Ryujinx and Yuzu" so they have "no need to buy [Nintendo's] hardware" to play Nintendo's games. *Id.* ¶ 71. <u>Third</u>, Defendant linked directly to prod.keys, which is also trafficking in circumvention technology. *Id.* ¶¶ 70–71, 73.

As detailed in the Complaint, Nintendo spent over two years attempting to enforce its rights against Defendant short of litigation. *Id.* ¶ 3. Nintendo submitted dozens of takedown notices pursuant to § 512 of the Copyright Act to have Defendant's unlawful streams taken offline, and recently multiple platforms shut down Defendant's channels because of his repeated infringement. *Id.* Yet Defendant continued to unlawfully stream Nintendo's copyrighted works and thumb his nose at Nintendo and the law. On Oct. 24, 2024, Defendant sent Nintendo a letter boasting that he has "a thousand burner channels" to stream from and "can do this all day." *Id.*

**D. Procedural History.**

Nintendo filed its Complaint on Nov. 6, 2024. Dkt. 1. Defendant evaded service and the Court authorized Nintendo to serve Defendant by substituted means (the "Order"). Dkts. 11, 13. Nintendo served the Summons and Complaint as directed by the Court's Order, completing

5

substituted service on Dec. 20, 2024. Dkts. 14, 22. Defendant's deadline to respond to Nintendo's complaint was Jan. 10, 2025. Dkt. 28-1 ¶ 11. Defendant failed to respond. *Id.* ¶ 12. On Mar. 26, 2025, the Clerk entered default against Defendant. Dkt. 29.

## II. Nintendo Has Established Defendant's Liability.

Nintendo moves for default judgment on: (Count I) infringement of Nintendo's exclusive rights to reproduce and publicly perform its copyrighted games under 17 U.S.C. §§ 106, 501; (Count III) circumvention of technological measures under 17 U.S.C. § 1201(a)(1); and (Counts IV & V) trafficking in circumvention technology under 17 U.S.C. §§ 1201(a)(2) & (b)(1). By his failure to respond, Defendant has admitted the factual allegations in Nintendo's complaint and the Court must accept the complaint's well-pleaded allegations regarding liability as true. *See Equal Emp. Opportunity Comm'n*, 28 F.4th at 157.

### A. Defendant is Liable for Direct Copyright Infringement (Count I).

To prevail on a claim of direct copyright infringement, Nintendo must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). In this test, "copying" is "a shorthand reference to any infringement of the copyright holder's exclusive rights that are set forth at 17 U.S.C. § 106." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 832 n.6 (10th Cir. 1993). Nintendo asserts violations of its right of public performance and right of reproduction.

Nintendo owns the ten games at issue, and each is an original audiovisual work protected by the Copyright Act. Compl. ¶ 60.[4] Defendant streamed these ten games without authorization at least fifty times across multiple platforms, all before the titles were released. *Supra* at 3. Nintendo

---

[4] *See also* Ex. A (identifying registrations for the works in suit). Registration is "prima facie evidence of the validity of the copyright." *Gates*, 9 F.3d at 831; *accord* 17 U.S.C. § 410(c).

6

has the exclusive right to publicly perform its works. 17 U.S.C. § 106(4). Streaming an audiovisual work like a Nintendo game is a public performance of that work. *See, e.g.*, *Am. Broad. Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431, 439–42 (2014); 17 U.S.C. § 101 ("perform" means "to show [an audiovisual work's] images in any sequence"). Moreover, because Defendant streamed each of these games prior to publication, he made at least one unauthorized reproduction of each game when streaming, two where he used an emulator. *Supra* at 3 & n.3; Compl. ¶ 78. Indeed, Defendant admitted to playing these games in emulators and on hacked consoles. *Supra* at 5.

Defendant is liable for copyright infringement by violating Nintendo's exclusive rights of public performance and reproduction as to the ten copyrighted video games discussed herein.

### B. Defendant Is Liable for Circumvention (Count III).

To prevail on a circumvention claim, Nintendo must establish that Defendant circumvented a technological measure that effectively controlled access to a copyrighted work. 17 U.S.C. § 1201(a)(1). As discussed above, Nintendo's video games are protected by numerous TPMs including the Game Encryption. *Supra* at 2. These effectively control access to Nintendo's works, because "in the ordinary course of [their] operation, [the TPMs] require[] the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B); *see Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650, 670 (D. Conn. 2022); *supra* at 2; Compl. ¶¶ 33–36, 96–98. Here, that "information" is Nintendo's proprietary cryptographic keys, and the "work[s]" are Nintendo's games. In the ordinary course, only an authentic, unmodified console running an authentic game can access and use prod.keys to decrypt Game Encryption, Compl. ¶ 40, so the Game Encryption is effective. Indeed, Congress expressly included "decrypt[ing] an encrypted work" as an example of circumventing an effective technological measure. 17 U.S.C. § 1201(a)(3)(A).

As discussed above, Defendant streamed the prerelease games from an emulator or from a hacked Nintendo Switch console—both of which require circumvention of the Game Encryption on those games. *Supra* at 4–5. Indeed, Defendant's admission of using emulators to play games further confirms that he has personally decrypted Nintendo's games, because emulators can only play Nintendo Switch games by first decrypting encrypted game files. *Supra* at 4–5.

Defendant is liable under 17 U.S.C. § 1201(a)(1) for circumvention of Nintendo's TPMs, including the Game Encryption, arising from his use of emulators or hacked consoles to decrypt each of the ten video games Defendant streamed.

### C. Defendant Is Liable For Trafficking in Circumvention Devices (Counts IV & V).

To prevail on a claim for trafficking in circumvention technology, Nintendo must establish that Defendant trafficked in technology that is primarily designed to circumvent technological measures that effectively control access to copyrighted works. 17 U.S.C. § 1201(a)(2). The statute provides in pertinent part that "[n]o person shall…offer to the public…any technology, product, service, device, component, or part thereof, that" is "primarily designed" for circumvention, "has only limited commercially significant purpose or use" apart from circumvention, or "is marketed by that person…with that person's knowledge for use" in circumvention. *Id.* §§ 1201(a)(2)(A)–(C). Similarly, § 1201(b)(1) makes unlawful engaging in the same conduct with regard to technology that circumvents protections that "effectively protect[] a right of a copyright owner." Put more simply, the trafficking prohibition in § 1201(a)(2) concerns *access control* measures—technological measures that protect against access to a work—while the trafficking prohibition in § 1201(b)(1) concerns *copy control* measures—technological measures that protect against the violation of an exclusive right of a copyright holder.

Here, Nintendo's TPMs are effective under both §§ 1201(a)(2) and (b)(1). In the "ordinary course," Nintendo's TPMs and Game Encryption "require the application of information," here,

8

prod.keys, "with the authority of" Nintendo to gain access to Nintendo's games. 17 U.S.C. § 1201(a)(3); *supra* at 2. By the same token, the TPMs protect against the public performance of Nintendo's games, because Defendant could not play or stream games he cannot access. Beyond the Game Encryption, Nintendo's TPMs on its console also prevent even encrypted game files from being copied off of a secure cartridge or console. Compl. ¶¶ 35, 40. Distributing software or devices that circumvent Nintendo's TPMs, then, is a violation of § 1201's trafficking prohibitions.

Counts IV and V arise in part from Defendant's distribution of links to Nintendo Switch emulators, including Yuzu and Ryujinx. Nintendo Switch emulators circumvent the Game Encryption enabling access to and play of pirated games on unauthorized platforms. *Supra* at 2; Compl. ¶¶ 40–44. Nintendo Switch emulators thus meet any of the three prongs of §§ 1201(a)(2) & (b)(1). Nintendo Switch emulators are circumvention devices, and distribution of them is unlawful trafficking. *See Nintendo of America Inc. v. Tropic Haze LLC*, No. 1:24-cv-00082, Dkt. 11 (D.R.I. 2024) (entering judgment and injunction providing that trafficking in the Nintendo Switch emulator Yuzu is trafficking in a circumvention device in violation of 17 U.S.C. § 1201).

Since Nintendo Switch emulators are circumvention devices, Defendant trafficked in circumvention devices. Defendant posted links to emulators such as Ryujinx and Yuzu. Compl. ¶¶ 70–71. Linking to circumvention technology is trafficking in that technology under § 1201. *See, e.g.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443 (2nd Cir. 2001); *Yout, LLC*, 633 F. Supp. 3d at 676–77; *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1093, 1098–99 (N.D. Cal. 2004); *U.S. v. Reichert*, 747 F.3d 445, 449 (6th Cir. 2014). And Defendant boasted, *after* a federal court found that Nintendo Switch emulators were unlawful circumvention devices, that he would continue to distribute them, would "actively help people find newer and updated copies of Ryujinx and Yuzu," would "help[] people to play…on their PC with

9

no need to buy [Nintendo's] hardware," and would "help[] anyone and everyone who wants to get Nintendo games for free (and early)." Compl. ¶¶ 13, 109.

Nintendo's trafficking claims also arise from Defendant's distribution of Nintendo's proprietary cryptographic keys, the prod.keys. Defendant linked to prod.keys, *id.* ¶ 71, and threatened more links to come. The prod.keys Defendant distributed can be directly used to decrypt Nintendo's encrypted video games. *Id.* ¶ 34. It is clear these keys qualify as circumvention technology under the statute too. *See, e.g.*, *Adobe Sys. Inc. v. Feather*, 895 F. Supp. 2d 297, 302 (D. Conn. 2012) (distributing product keys that activate software without authorization is unlawful trafficking). By distributing the prod.keys without Nintendo's authorization, Defendant unlawfully trafficked in them. Defendant is thus liable for trafficking in circumvention technology under 17 U.S.C. §§ 1201(a)(2) (Count IV) & 1201(b)(1) (Count V).

### III. This Court Should Enter Default Judgment Against Defendant.

Nintendo has obtained an entry of default. Dkt. 29. Nintendo now applies to this Court for a default judgment against Defendant. Rule 55(b)(2); *Camp Bow Wow Franchising, Inc. v. Gone to the Dogs, LLC*, No. 22-cv-01252-PAB-STV, 2025 WL 523069, at *2 (D. Colo. Feb. 18, 2025) (granting default judgment is a matter for the Court). The decision to enter default judgment is entrusted to "the district court's sound discretion." *Villanueva v. Acct. Discovery Sys., LLC*, 77 F. Supp. 3d 1058, 1066 (D. Colo. 2015) (quoting *Olcott v. Delaware Flood Co.*, 327 F.3d 1115, 1124 (10th Cir. 2003)). The Court should assure itself of jurisdiction, decide "whether the unchallenged facts create a legitimate basis for the entry of a judgment," *id.*, and ascertain damages.

First, this Court has personal and subject-matter jurisdiction. As to personal jurisdiction, Defendant resides within and is domiciled in this District, Compl. ¶ 23, he was served by substituted service in this District, *supra* at 10, and a substantial part of the events giving rise to

10

the claims occurred in this District. As to subject-matter jurisdiction, this Court has original jurisdiction over this action under 28 U.S.C. §§ 1331, 1338(a), and 17 U.S.C. §§ 106, 501, 1201, & 1203. Second, the "unchallenged facts create a legitimate basis for the entry of a judgment." *Villanueva*, 77 F. Supp. 3d at 1066 (citation omitted). As described in detail above, the well-pled allegations in the Complaint establish Defendant's liability on the four counts discussed herein.

Third, Nintendo is entitled to damages. A prevailing plaintiff is entitled to its election of actual or statutory damages. 17 U.S.C. §§ 504, 1203. Nintendo elects statutory damages, which are particularly "appropriate in the default judgment context." *Tague v. Mind Rocket, LLC*, No. 20-CV-00230-REB-KLM, 2023 WL 11992382, at *2 (D. Colo. Mar. 1, 2023). Courts have "broad discretion" in awarding statutory damages under the Copyright Act within the statutory limits. *Grady v. Nelson*, No. 12-CV-03004-RM-KMT, 2014 WL 7143852, at *9 (D. Colo. Dec. 15, 2014).

**Statutory Damages for Count I.** By defaulting, Defendant has conceded liability for unlawfully reproducing and publicly performing all ten works in suit, Compl. ¶¶ 47–51, for which Nintendo is entitled to damages, 17 U.S.C. § 504. To simplify the damages analysis, Nintendo seeks a single statutory damages award for a representative work in suit. Specifically, Nintendo seeks an award of $10,000 for infringement of *Paper Mario: The Thousand-Year Door*.[5] The Copyright Act provides for $750 to $30,000 per work for non-willful infringement, up to $150,000 per work for willful infringement. *Id.* § 504(c). Courts consider factors such as the defendant's "degree of culpability," and the "need for deterrence and punishment." *Grady*, 2014 WL 7143852, at *9. Here, Nintendo's allegations establish that Defendant's infringement was willful and that a high damages award is warranted to deter future infringement. Defendant has been infringing Nintendo's video games since early 2022, and has been on notice of the wrongfulness of that

---

[5] *Paper Mario* was first published and registered in 2004. Ex. A.

11

infringement for at least the last two years, as Nintendo sent dozens of takedown notices for Defendant's streams of prerelease video games. *Supra* at 5. But Defendant persisted, moving his streams to other platforms, emailing Nintendo directly saying he can "do this all day," and promising to "help[] anyone and everyone who wants to get Nintendo games for free (and early)." Compl. ¶¶ 3, 13, 50. Indeed, it was precisely this conduct that necessitated this lawsuit, which Defendant has deigned to ignore. In similar circumstances where defendants "knew about, but repeatedly ignored" copyright notices and encouraged and assisted others' infringement but failed to appear, courts in this District have awarded significant statutory damages. *See Stockart.com, LLC v. Engle*, No. 10-CV-00588-MSK-MEH, 2011 WL 10894610, at *14 (D. Colo. Feb. 18, 2011) (granting a default judgment awarding $30,000 per work); *Grady*, 2014 WL 7143852, at *9 (granting default judgment awarding $7,000 per work). Here, an award of $10,000 is eminently reasonable for Defendant's blatant streaming of Nintendo's video games before any ordinary consumer had lawful access. It is particularly reasonable since Nintendo is electing not to seek damages for infringement of the other nine works as to which Nintendo has established liability. *See MidlevelU, Inc. v. ACI Info. Group*, 989 F.3d 1205, 1218 (11th Cir. 2021) (infringement of other works relevant for purpose of setting the amount of statutory damages on a given work).

**Statutory Damages for Counts III, IV, and V.** On the circumvention and trafficking claims, Nintendo seeks a statutory damages award of $7,500—$500 each for 15 violations. Nintendo has established liability for at least ten acts of circumvention—circumvention of each of the ten games Defendant streamed at least once—and five acts of trafficking in circumvention devices—distribution of four links to Nintendo Switch emulators and one link to prod.keys. *Supra* at 5; Compl. ¶¶ 63–71. Nintendo is entitled to statutory damages under 17 U.S.C. § 1203(c)(3)(1) in an amount of not less than $200 and not more than $2,500 per act of circumvention or

12

trafficking. As above, Defendant's willfulness and the need for deterrence strongly weighs in favor of a high damages award, and courts regularly award substantial sums for violations of Section 1201. For instance, in *Sony Computer Ent. Am., Inc. v. Filipiak*, the Court awarded between $800 and $2,500 per circumvention device. 406 F. Supp. 2d 1068, 1075 (N.D. Cal. 2005). And in *Craigslist, Inc. v. Naturemarket, Inc.*, the Court granted default judgment and awarded $1,000 per instance of trafficking in a circumvention device. 694 F. Supp. 2d 1039, 1063–64 (N.D. Cal. 2010).

"[I]nfringers should not be free to 'sneer' in the face of the Copyright Act; courts must put defendants on notice that it costs less to obey the Copyright Act than to violate it." *Girlsongs v. 609 Indus., Inc.*, 625 F. Supp. 2d 1127, 1131 (D. Colo. 2008) (citation omitted). For two years, Nintendo used enforcement measures short of litigation, but Defendant persisted in violating Nintendo's rights; this Court should deter Defendant's "sneer[ing]" of the Copyright Act. *Id.* Nintendo's requests for statutory damages are targeted and reasonable, particularly since Nintendo does not seek an award of attorneys' fees or costs, as it would be entitled to do. This Court should exercise its discretion to enter default judgment against Defendant, including a total damages award of $17,500 ($10,000 on Count I + $5,000 on Count III + $2,500 on Counts IV & V).

## IV.     Nintendo Is Entitled to a Permanent Injunction.

In its Complaint, Nintendo seeks a permanent injunction against Defendant to restrain him from engaging in further violations of Nintendo's rights. As set forth in Nintendo's Proposed Judgment & Permanent Injunction, filed contemporaneously herewith, Nintendo seeks an injunction, among other things: (1) preventing Defendant from (a) infringing Nintendo's copyrighted works, including by streaming, (b) trafficking in Nintendo Switch emulators, Nintendo's proprietary cryptographic keys, or other software or technologies that circumvent Nintendo's effective TPMs; (2) enjoining third parties working in concert with Defendant and with

13

notice of the order from the same conduct; and (3) requiring Defendant to destroy all circumvention devices in Defendant's possession. The injunction sought by Nintendo is expressly authorized by law and is necessary to prevent Defendant from continuing to violate it.

The Copyright Act authorizes the Court to grant "final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Similarly, § 1203(b) authorizes the Court to "grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation," of § 1201 and to "order the impounding, on such terms as it deems reasonable, of any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation." 17 U.S.C. §§ 1203(b)(1)–(2). In order to obtain a permanent injunction, a party must show, in addition to success or likelihood of success on the merits: (1) irreparable harm; (2) lack of adequate remedies at law; (3) that the balance of hardships weighs in its favor; and (4) that the injunction is in the public's interest. *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 393–94 (2006).

First, Nintendo has shown it will succeed on the merits of its claims under its well-pled allegations. *See supra* § II. Second, Nintendo will suffer irreparable harm unless an injunction is issued. In general, a copyright owner who demonstrates past infringement and a substantial likelihood of future infringement is entitled to a permanent injunction, even if there is no ongoing infringement. *See Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 492 (6th Cir. 2007); *Walt Disney Co. v. Powell*, 897 F.2d 565, 568 (D.C. Cir. 1990). Moreover, Defendant has continued violating Nintendo's rights despite years of efforts to enforce its rights absent litigation, and Defendant has evaded service and otherwise refused to participate in this lawsuit, further underscoring that he is not to be trusted to comply with the law on his own. *See supra* at 5.

Third, an award of monetary damages is insufficient to protect against Defendant's likely

future infringement. *See, e.g.*, *Your True Nature, Inc. v. JF Show Store*, No. 1:23-cv-00107-GPG-NRN, 2024 WL 3340974, at *5 (D. Colo. June 21, 2024) (finding that an award of monetary damages is not an adequate remedy if infringing acts continued); *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 553 (S.D.N.Y. 2008) (finding money damages alone are not an adequate remedy in view of irreparable harm from continued infringement). This is particularly true since Defendant has refused to appear or participate in this lawsuit. *See, e.g.*, *Duffy Archive Ltd. v. Montage Salon Corp.*, No. 23-cv-02019-PAB-MDB, 2025 WL 661614, at *8 (D. Colo. Feb. 28, 2025) (granting injunctive relief because the defendant "ha[d] not appeared in this action and, therefore, has given no assurances to the Court it will cease using the" copyrighted works).

Fourth, the threatened injury to Nintendo outweighs whatever harm—if any—Defendant would experience from an injunction. Defendant has no legitimate purpose in infringing Nintendo's rights, including leaking video games before their release or trafficking in illegal circumvention devices. The requested injunction would simply require Defendant to comply with the law, which is no injury at all. *See Duffy Archive*, 2025 WL 661614, at *8 (the "potential injury to an allegedly infringing party caused by an injunction merits little equitable consideration and is insufficient to outweigh the continued wrongful infringement").

Fifth, the requested injunction would serve the public interest. "In copyright cases, this factor 'weighs in favor of issuance of an injunction because the public interest is the interest in upholding copyright protections.'" *Id*. (citing *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1499 (10th Cir. 1993)). As such, the requested permanent injunction is warranted.

## V.  Conclusion.

Nintendo respectfully requests that this Court enter default judgment against Defendant on each of the claims set forth above and issue the requested permanent injunction.

DATED this 18th day of April, 2025.

        Respectfully submitted,

        **JENNER & BLOCK LLP**

        _/s/ Alison I. Stein_
        Alison I. Stein (N.Y. Bar. No. 4787230)*
        Cayman C. Mitchell (N.Y. Bar No. 5978812)*
        1155 Avenue of the Americas
        New York, NY 10036
        Telephone: (212) 891-1600
        Facsimile: (212) 891-1699
        astein@jenner.com
        cmitchell@jenner.com

        Gail H. Morse (Colorado Bar No. 023813)*
        353 N. Clark Street
        Chicago, IL 60654
        Telephone: (312) 222-9350
        Facsimile: (312) 527-0484
        gmorse@jenner.com

        *Admitted in D. Colorado

        _Attorneys for Plaintiff Nintendo of America Inc._