**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-03101-GPG-STV

NINTENDO OF AMERICA, INC,

      Plaintiff,

v.

JESSE KEIGHIN,

      Defendant.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

Chief Magistrate Judge Scott T. Varholak

      This matter comes before the Court on Plaintiff's Motion for Default Judgment (the "Motion") [#33] which has been referred to this Court [#35].  This Court has carefully considered the Motion and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist the Court.  For the following reasons, the Court respectfully **RECOMMENDS** that the Motion be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND[1]

Plaintiff Nintendo of America Inc. markets and distributes electronic video game consoles, games, and accessories.[2]  [#1 at ¶ 1]  Defendant Jesse Keighin is an individual who live streams video games on platforms such as YouTube, Twitch, and TikTok.  [*Id.* at ¶ 2]

### A.    Nintendo Technology

Nintendo creates and publishes video games that are made exclusively for play on a gaming console known as the Nintendo Switch ("Switch").  [*Id.* at ¶ 26]  Nintendo allows users either to purchase physical cartridges of Switch games or to download digital Switch games from Nintendo's online store.  [*Id.* at ¶ 33]  These authorized copies of Nintendo's games are protected by multiple technological measures.  [*Id.*]  For example, Switch games are encrypted, requiring a specific cryptographic key to decrypt them.  [*Id.* at ¶ 34]  The key that unlocks a particular game's encryption is referred to as the "Title Key" and is distributed by Nintendo with a lawfully obtained, encrypted copy of a Switch game file.  [*Id.*]  In addition, the Title Key is itself encrypted, and can be decrypted with another

---

[1] The following facts are taken from Plaintiff's Complaint and Demand for Jury Trial (the "Complaint").  [#1]  "Allegations against the defendant[ ] in default are deemed true for the purposes of the Motion for Default Judgment."  *Mighty Argo Cable Car, LLC v. Trivecta Cap. Grp., Inc.*, No. 21-cv-01106-RMR-NRN, 2022 WL 4115690, at *1 (D. Colo. Sept. 9, 2022), *report and recommendation adopted*, 2022 WL 8166234 (D. Colo. Sept. 23, 2022).
[2] Nintendo of America Inc. is a wholly owned subsidiary of Nintendo Co., Ltd.  "Nintendo of America Inc. and Nintendo Co., Ltd." are together referred to herein as "Nintendo."

cryptographic key known as a prod.key. [*Id.*] Unauthorized copies of games are colloquially known as ROMs.[3] [*Id.* at ¶ 3 n.2]

The Switch devices themselves also contain technological measures which, among other things, verify the console's authenticity and prevent unauthorized access to and copying of software, firmware, and data such as prod.keys. [*Id.* at ¶ 35] A video game emulator is a piece of software that allows general-purpose computing devices to play video games published only for a specific console. [*Id.* at ¶ 37] Two popular emulators for Switch games are Yuzu and Ryujinx,[4] which are compatible with major operating systems such as Windows and MacOS. [*Id.*] This means that individuals using emulators could play Switch games on a computer, rather than the Switch console. [*Id.* at ¶¶ 37-38] Yuzu and Ryujinx are not compatible with games made for any console except the Switch. [*Id.* at ¶ 37]

An individual can play games which they did not lawfully obtain on an emulator. [*Id.* at ¶ 38] This is possible when the individual unlawfully obtains a copy of the prod.keys and an encrypted Switch game ROM. [*Id.*] All three things (the emulator, the prod.keys, and the encrypted game ROMs) are necessary to play a pirated game. [*Id.*] An encrypted Switch game ROM may be obtained in two ways. [*Id.* at ¶ 39] First, one may download a pirated ROM; repositories of pirated Switch ROMs are available online. [*Id.*] Second,

---

[3] The acronym "ROM" stands for read-only memory. [*Id.* at ¶ 3 n.2]

[4] The development of the Yuzu emulator has since been enjoined. A court held that it violated 17 U.S.C. § 1201. *See* Final Judgment & Permanent Injunction, *Nintendo of Am., Inc. v. Tropic Haze LLC*, No. 1:24-cv-00082, Dkt. 11 (D.R.I. 2024). Ryujinx's code repository has been removed from online sources voluntarily by its creator. [#1 at ¶ 44] However, both emulators were open-source projects, meaning the code used to create the emulators was made publicly available. [*Id.* at ¶ 45] Accordingly, individuals have been able to reproduce both emulators using Yuzu and Ryujinx's source code, which individuals may have copied before emulators were removed from online sources. [*Id.*]

one may circumvent a game cartridge or digital download and make a reproduction of the game.  [*Id.*]  Emulators unlawfully decrypt a ROM's game encryption by identifying the encrypted Title Key that accompanies the game file and using unlawfully obtained prod.keys to decrypt the Title Key.  [*Id.* at ¶ 42]  Emulators and unauthorized prod.keys are also available online.  [*Id.* at ¶¶ 70-71]

### B.    Defendant's Actions

On at least fifty occasions, Defendant has live streamed gameplay footage of at least ten different games without authorization and before the games were released to the public.  [*Id.* at ¶ 47]  For example, on October 22, 2024, Defendant live streamed a pirated copy of *Mario & Luigi: Brothership* on YouTube and other streaming platforms 16 days prior to the game's official release date.  [*Id.* at ¶ 49]  Defendant also streamed this game on at least four other occasions prior to the official release date. [*Id.*]  In his streams, Defendant told viewers to go to another streaming platform, loco.gg, if the stream was taken down.  [*Id.* at ¶ 50]  After YouTube removed this stream for violation of its rules, Defendant continued to stream the game on loco.gg.  [*Id.*]  Defendant included a QR code in these streams linking his CashApp account so that viewers could donate to Defendant. [*Id.*]  These streams often have titles such as "EARLY RELEASE" or "FIRST LOOK" of the unreleased game.  [*Id.* at ¶ 46]

Nintendo submitted "dozens" of takedown notices to remove Defendant's live streams and to shut down the channels on which he was engaged in the unlawful streaming.  [*Id.* at ¶ 3]  When platforms suspend Defendant's accounts, he creates a new account to continue to stream the pirated games.  [*Id.* at ¶ 50]  After having his streams taken down, Defendant emailed Nintendo, stating "I have a thousand burner channels"

and "[w]e can do this all day."  [*Id.*]  Other games that Defendant streamed prior to their release dates include: *Super Mario Party Jamboree*, *The Legends of Zelda: Echoes of Wisdom*, *Paper Mario: The Thousand-Year Door*, *Mario vs. Donkey Kong*, *Super Mario RPG*, *Super Mario Bros. Wonder*, *Pikmin 4*, *Splatoon 3*, and *Mario Strikers: Battle League*.  [*Id.* at ¶¶ 51-59]  On his *Pikmin 4* stream on YouTube, Defendant commented "I got two copyright strikes streaming it early [laughing emoji] Gotta play it safe for 90 days [grinning emoji]."  [*Id.* at ¶ 57]

        In addition to playing games before their release date, Defendant has publicly released links to repositories of Nintendo ROMs for many of Nintendo's consoles, including Switch-specific pirated ROMs.  [*Id.* at ¶ 62]  Defendant has also publicly posted and shared links to Ryujinx, Yuzu, other emulators, and cryptographic keys.  [*Id.* at ¶ 70]  Defendant live streamed himself playing games on an emulator, including at least *The Legends of Zelda: Echoes of Wisdom* and *Super Mario Party Jamboree*.  [*Id.* at ¶¶ 65-67]  Defendant also admitted to "testing" games in emulators.  [*Id.* at ¶ 65]  Defendant implied that he has live streamed Nintendo games from an emulator by stating, in response to having a video taken down for copyright infringement on YouTube, "I am not even using Nintendo's hardware for presentation."  [*Id.* at ¶ 64]

        In an email to Nintendo, Defendant stated that he "will actively help people find newer and updated copies of Ryujinx and Yuzu (Yes, they're still being developed underground) and sharing ALL of the ROM resources . . . as well as helping people to play . . . on their PC with no need to buy your hardware."  [*Id.* at ¶¶ 71, 88]  In a Facebook

post, Defendant also stated that he "can't wait for more new games to stream and give away for free." [*Id.* at ¶ 81]

Plaintiff alleges that it has experienced harm in various forms. First, Plaintiff alleges that emulators are used to enable users to play pirated games, causing millions of dollars of monetary harm from lost video game sales. [*Id.* at ¶ 44] Second, Plaintiff alleges that piracy causes a loss of goodwill. [*Id.*] Additionally, Plaintiff alleges that piracy of pre-released games causes harm to Nintendo fans by spoiling the surprise related to the release of a new game. [*Id.*]

### C.    Procedural History

Plaintiff filed this action on November 6, 2024. [#1] Plaintiff brings four claims against Defendant. In Count One, Plaintiff alleges unauthorized public performance and reproduction of protected works in violation of 17 U.S.C. §§ 106(1), 106(4), 501(a). [*Id.* at ¶¶ 74-84] In Count Two, Plaintiff alleges contributory and inducement liability for unauthorized reproduction of protected works in violation of 17 U.S.C. §§ 106(1), 501(a). [*Id.* at ¶¶ 85-94] In Count Three, Plaintiff alleges circumvention of technological measures in violation of 17 U.S.C. § 1201(a)(1). [*Id.* at ¶¶ 95-103] In Count Four, Plaintiff alleges trafficking in circumvention technology in violation of 17 U.S.C. § 1201(a)(2). [*Id.* at ¶¶ 104-16] In Count Five, Plaintiff alleges trafficking in circumvention technology in violation of 17 U.S.C. § 1201(b)(1). [*Id.* at ¶¶ 117-29]

Defendant failed to respond to the Complaint. As a result, on March 25, 2025, Plaintiff filed a Motion for Entry of Default. [#28] The Clerk entered default as to Defendant on March 26, 2025. [#29] Plaintiff filed this Motion for Default Judgment on

April 18, 2025.  [#33]  Plaintiff moves for default judgment on Counts One, Three, Four,

and Five.[5]  [#33 at 7[6]]  Defendant did not respond.

## II.     JURISDICTION

Default may be entered against a party who has failed to plead or otherwise

defend.  Fed. R. Civ. P. 55(a).  Before entering default judgment, however, the Court must

first consider whether it has subject matter and personal jurisdiction over the absent party.

*See Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 772 (10th

Cir. 1997); *Williams v. Life Sav. and Loan*, 802 F.2d 1200, 1202-03 (10th Cir. 1986).

### A.     Subject Matter Jurisdiction

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §

1331, which grants federal district courts original jurisdiction over "all civil actions arising

under the Constitution, laws, or treaties of the United States."  In addition, the Court has

subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1338, which grants

federal district courts with original jurisdiction over "any civil action arising under any Act

of Congress relating to patents, plant variety protection, copyrights and trademarks."

Plaintiff asserts all five of its claims under Title 17 of the United States Code, which

---

[5] Pursuant to Federal Rule of Civil Procedure 54(b), a "court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  "[T]rial courts should be reluctant to enter Rule 54(b) orders since the purpose of this rule is a limited one: to provide a recourse for litigants when dismissal of less than all their claims will create undue hardships."  *Okla. Tpk. Auth. v. Bruner*, 259 F.3d 1236, 1242 (10th Cir. 2001) (quoting *Gas–A–Car, Inc. v. Am. Petrofina, Inc.,* 484 F.2d 1102, 1105 (10th Cir. 1973)).  Here, Plaintiff has not addressed Rule 54(b) or provided justification for granting judgment on Counts One, Three, Four and Five but allowing Claim Two to continue.  Thus, the Court deems the Motion for Judgment on Counts One, Three, Four and Five to be an implicit indication that Plaintiff seeks to dismiss Claim Two.
[6] Page numbers on the [#33] Motion for Default Judgment refer to the page numbers generated by CM/ECF at the top of each page.

contains various laws enacted by Congress in the realm of copyrights. Plaintiff specifically seeks relief pursuant to 17 U.S.C. §§ 106, 501, 1201, and 1203. [#1 at ¶¶ 74-129] Thus, this court has subject matter jurisdiction over Plaintiff's claims.

### B.    Personal Jurisdiction

To determine whether there is personal jurisdiction, this Court must first address the adequacy of service. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."); *Okla. Radio Assocs. v. Fed. Deposit Ins. Corp.*, 969 F.2d 940, 943 (10th Cir. 1992) ("[S]ervice of process provides the mechanism by which a court having venue and jurisdiction over the subject matter of an action asserts jurisdiction over the person of the party served."). Under Federal Rule of Civil Procedure 4(e)(1), an individual "may be served in a judicial district of the United States by following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Colorado Rule of Civil Procedure 4(f) states that "[i]n the event that a party attempting service of process by personal service under section (e) is unable to accomplish service, and service by publication or mail is not otherwise permitted under section (g), the party may file a motion . . . for substituted service."

Here, Plaintiff filed a Motion for Substituted Service on December 13, 2024, detailing failed attempts at serving Defendant. [#11] The Court granted the Motion for Substituted Service on December 18, 2024. [#13] In the Court's Order granting the Motion for Substituted Service, Plaintiff was authorized to personally serve Defendant by substituted service on Melina Foy, Mary Twist, and Tracy Harsh at their three individual

addresses in this District.[7]  [*Id.* at 3]   The Court ordered that service of process be effectuated upon Defendant by sending a copy of the summons, Complaint, and all other relevant documents, via registered mail with delivery confirmation to Defendant's last known address, to the address at which Defendant's partner resides, and via email to everygameguru@gmail.com.[8]  [*Id.* at 3-4]

In a status report entered on December 20, 2024, Plaintiff certified that process was served as directed by the Court's Order.  [#14]  On January 29, 2025, Plaintiff filed a declaration affirming that Plaintiff engaged two process servers to serve process upon the substituted persons and that the process servers delivered the required documents to the authorized addresses.   [#22]   One of the service packages was delivered successfully; another was refused.  [*Id.* at ¶ 5]  The declaration also affirmed that a copy of the summons, Complaint, and Order were sent to Defendant's email.  [*Id.* at ¶ 6]  Given that Plaintiff affirmed that service was achieved in compliance with the Court's Order regarding substituted service, the Court finds that Defendant was properly served.[9]

The Court next considers whether it has personal jurisdiction over Defendant. "[T]he plaintiff need only make a *prima facie* showing [of personal jurisdiction] if the motion [for default judgment] is decided only on the basis of the parties' affidavits and other written materials."   *Dennis Garberg & Assocs., Inc.*, 115 F.3d at 773.   "A court may exercise general personal jurisdiction or specific personal jurisdiction over a defendant." *Pilgrim's Pride Corp. v. Allegiant Elec., Inc.*, 717 F. Supp. 3d 1036, 1044 (D. Colo. 2024)

---

[7] These individuals are Defendant's partner, grandmother, and mother.  [*Id.* at 3]

[8] This is the email from which Defendant sent Nintendo various messages, including "I have a thousand burner channels" and "we can do this all day."  [#1 at ¶ 50]

[9] Indeed, Defendant had actual knowledge of the lawsuit before substitute service was authorized and effectuated.  [#11 at 7-12]

(citing *Bristol Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017)). "General jurisdiction is available if the defendant's affiliations with the forum state are 'so continuous and systematic' that it is 'essentially at home' in the state." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Id.* (quoting *Goodyear Dunlop Tires Operations,* 564 U.S. at 919). "Domicile is not necessarily synonymous with residence, and one can reside in one place but be domiciled in another. For adults, domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) (internal citations and quotations omitted). Nevertheless, "the place of residence is prima facie the domicile." *State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994) (citing *Walden v. Broce Constr. Co.*, 357 F.2d 242, 245 (10th Cir. 1966), and *Houston v. Astle*, 435 F.2d 847, 848 (3d Cir. 1970)).

Defendant's last known residence was in Colorado. [#11 at 3-4] Indeed, all residences that are associated with Defendant are in Colorado. [*Id.* at 3-5] Accordingly, because Defendant has been shown to reside in Colorado, Defendant's domicile is prima facie located in this District. Defendant was also served by substituted service at various locations, all within this District. Therefore, Plaintiff has shown that the Court has general personal jurisdiction over Defendant.

## III.    LIABILITY AND RELIEF

Having determined that jurisdiction has been established, this Court turns to the merits of Plaintiff's request for default judgment. The Court must consider whether the

unchallenged facts constitute a legitimate cause of action such that a judgment should be entered. *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010); *Malibu Media, LLC v. Ling*, 80 F. Supp. 3d 1231, 1239 (D. Colo. 2015). "There must be a sufficient basis in the pleadings for the judgment entered." *Bixler*, 596 F.3d at 762 (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). In determining whether a claim for relief has been established, the well-pleaded facts of the complaint are deemed true. *See United States v. Craighead*, 176 F. App'x 922, 923-24 (10th Cir. 2006); *Malibu Media*, 80 F. Supp. 3d at 1239. Undisputed facts set forth in any affidavits and exhibits are also accepted as true. *See Reg'l Dist. Council v. Mile High Rodbusters, Inc.*, 82 F. Supp. 3d 1235, 1242-43 (D. Colo. 2015). Finally, the relief provided in a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). The Court begins with Defendant's liability and then turns to the relief requested by Plaintiff.

### A.    Defendant Liability

#### 1.    Count One

In Count One, Plaintiff alleges that Defendant publicly performed and reproduced protected works without authorization in violation of 17 U.S.C. §§ 106(1), 106(4), and 501(a). [#1 at ¶¶ 74-84] "[T]he owner of copyright under [Title 17] has the exclusive rights to do and to authorize . . . reproduc[tion] [of] the copyrighted work in copies or phonorecords." 17 U.S.C. § 106(1). In addition, owners of copyright on audiovisual works have the exclusive right to "perform the copyrighted work publicly." *Id.* § 106(4). An audiovisual work is a work that consists "of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors,

viewers, or electronic equipment, together with accompanying sounds." *Id.* § 101.    To

"perform" an audiovisual copyrighted work means "to show its images in any sequence

or to make the sounds accompanying it audible." *Id.* "Anyone who violates any of the

exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an

infringer of the copyright." *Id.* § 501(a).

"There are two elements to a copyright infringement claim: '(1) ownership of a valid

copyright, and (2) copying of constituent elements of the work that are original.'" *La

Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009) (quoting

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).    For the second

element, plaintiffs must show that a Defendant "unlawfully appropriated protected portions

of the copyrighted work." *Id.* at 1178 (quoting *Gates Rubber Co. v. Bando Chem Indus.,

Ltd.*, 9 F.3d 823, 832 (10th Cir. 1993)).    "This requires proving both: (1) that [a defendant],

as a factual matter, copied portions of [the plaintiff's] work; and (2) that those elements of

the work that were copied were 'protected expression and of such importance to the

copied work that the appropriation is actionable.'" *Id.* (quoting *Gates Rubber Co.*, 9 F.3d

at 832).

The unchallenged facts constitute a legitimate cause of action here.    Plaintiff has

alleged that Nintendo has a valid copyright on the ten video games that Defendant live

streamed.  [#1 at ¶ 76]  The video games are shown by electronic equipment, such as a

Switch, together with accompanying sounds.  [*Id.* at ¶¶ 25, 31, 33, 61]  Defendant's live

streams of gameplay of the copyrighted works involved showing images of the games.

[*Id.* at ¶¶ 51-59]  The live streams were public on platforms such as YouTube and Discord. [*Id.* at ¶ 2]

Plaintiff has also alleged that the games Defendant live streamed could not have been lawfully obtained copies of the games because the games were not publicly available at the time of the live streams.  [*Id.* at ¶ 78]  Indeed, Defendant himself suggested he had improperly obtained the games when he stated that he was "not even using Nintendo's hardware for presentation."  [*Id.* at ¶ 64]  Plaintiff explains how the unauthorized copies were pirated and resulted in copies nearly identical to the copyrighted works.  [*Id.* at ¶¶ 37-45, 69]  And Defendant used the Nintendo-given titles of these games in the titles of his live streams, often calling them an "early release" of the upcoming Nintendo game.  [*Id.* at ¶¶ 51-59]  Therefore, Plaintiff has shown that Defendant copied substantial protected expression of Plaintiff's copyrighted work.  Thus, Plaintiff has shown that Defendant violated Plaintiff's copyright under 17 U.S.C. §§ 106(1), 106(4), and 501(a) for each of the ten games Defendant streamed before its release.

### 2.    Count Three

In Count Three, Plaintiff alleges that Defendant circumvented technological measures in violation of 17 U.S.C. § 1201(a)(1).  [*Id.* at ¶¶ 95-103]  "No person shall circumvent a technological measure that effectively controls access to a work protected under this title."  17 U.S.C. § 1201(a)(1)(A). To circumvent a technological measure "means to . . . decrypt an encrypted work, or otherwise avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."  *Id.* § 1201(a)(3)(A).  A technological measure effectively controls access to a work if it, "in the ordinary course of operation, requires the application of information, or a process or a

treatment, with the authority of the copyright owner, to gain access to the work." *Id.* §
1201(a)(3)(B).

Evasion of basic protection measures, such as by "using the correct username and
password to access a copyrighted work, even without authorization to do so," has been
held by district courts to "not constitute circumvention under Section 1201(a)." *Digit.
Drilling Data Sys. LLC v. Petrolink Servs. Inc.*, No. 4:15-cv-02172, 2018 WL 2267139, at
*14 (S.D. Tex. May 16, 2018). However, courts have held that devices containing more
intricate security systems, such the Nintendo DS security system which involves
"repeated transfers of information to gain access to" various programs which then allow
a user "to gain access to any copyrighted Nintendo DS game," are technological
measures that effectively control access to copyrighted works. *Nintendo of Am. Inc. v.
Chan*, No. CV 09-4203 JFW (PLAx., 2009 WL 2190186, at *3 (C.D. Cal. July 21, 2009).
Accordingly, circumventing such intricate security systems could constitute a violation of
Section 1201(a) and (b). *Id.*

As previously described, Nintendo's video games are protected by various
technological measures including encryption. [#1 at ¶ 34] Plaintiff has alleged that
Defendant personally "tested" and streamed himself playing games on an emulator, which
necessarily requires decryption of Nintendo's game encryption without authorization. [*Id.*
at ¶¶ 42, 65-67] Given that Defendant could not have lawfully obtained the ten video
games at the time he live streamed them, as he live streamed them prior to their release,

the Court finds that Plaintiff has adequately alleged that Defendant played all ten of the
pirated prerelease games on an emulator or on a hacked Switch device.[10]

Circumvention of a technological measure includes decrypting an encrypted work
without authority of the copyright holder.  17 U.S.C. § 1201(a)(3)(A).  Plaintiff alleges that
Defendant decrypted encrypted games by using an emulator or hacked Switch device.
[#1 at ¶¶ 69, 98]  The encryption and other technological measures effectively controlled
access to Nintendo Switch games because, in the ordinary course of operation, Switch
games require application of Nintendo's proprietary cryptographic keys, with Nintendo's
authority, to be able to decrypt and play the game.  [*Id.* at ¶ 34]  The protection measures
employed by Nintendo amount to far more than simply typing in a correct username and
password.  The protective measures involve advanced technology requiring multiple
decryption steps and keys created and known only to Nintendo in the ordinary course of
operation.  [*Id.*]  Accordingly, Plaintiff has shown that Defendant violated Section 1201(a)
each time he played an unreleased game.

### 3.    Count Four

In Count Four, Plaintiff alleges that Defendant trafficked in circumvention
technology in violation of 17 U.S.C. § 1201(a)(2).  [*Id.* at ¶¶ 104-16]  That Section
provides:

> No person shall manufacture, import, offer to the public, or
> otherwise traffic in any technology, product, service, device,
> component, or part thereof, that --

---

[10] An authentic unmodified Switch device includes technological measures that would
prevent a user from decrypting, accessing, or playing pirated Switch games.  [##1 at ¶
35; 33 at 5]

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under [Title 17];

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under [Title 17]; or

(C) is marketed by that person or another acting in concert with that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under [Title 17].

17 U.S.C. §§ 1201(a)(2).

Courts outside of this jurisdiction have addressed trafficking of circumvention technology in the realm of video games. For example, *Davidson & Ass'cs, Inc. v. Internet Gateway, Inc.*, involved a gaming service and computer games offered by the company Blizzard. 334 F. Supp. 2d 1164, 1168 (E.D. Mo. 2004). Blizzard developed a service called "Battle.net" which allowed computer game players to play games against each other by linking together over the Internet. *Id.* "The Battle.net service [was] designed to prohibit access and use of Battle.net mode by" users with unauthorized or pirated copies of games. *Id.* at 1169. To gain access to the Battle.net service, a process was initiated which involved an encryption algorithm. *Id.*

Games sold by Blizzard were "designed to connect only to Battle.net servers.*" Id.* at 1173. The defendant in that case created and distributed an emulator which provided "a server that would allow gamers unable or not wishing to connect to Battle.net to experience" features of Blizzard's games that normally would only be accessible with Battle.net. *Id.* at 1172. The court found that the defendant trafficked in anti-circumvention technology because the purpose in developing the server "was to avoid the anti-

16

circumvention restrictions of the game to avoid the restricted access to Battle.net," and because the emulator had limited commercial purpose in that "it was free and available to anyone who wanted to copy and use the program."  *Id.* at 1186.

Here, Plaintiff alleges that Defendant posted public links to emulators and decryption keys.  [#1 at ¶¶ 70-73]  Plaintiff alleges that Yuzu, Ryujinx, and other emulators are primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to Nintendo's games.  [*Id.* at ¶ 108]  Yuzu and Ryujinx allow individuals to play Switch games on the computer.  [*Id.* at ¶ 37]  Yuzu and Ryujinx are compatible only with Switch games, not with games made for any other type of video game console.  [*Id.*]  There is no other alleged use for these emulators.  Like the Battle.net emulator in *Davidson & Ass'cs, Inc.*, the emulators in this case evade technological measures which prevent an individual from playing Nintendo games on other consoles and from playing pirated games.  Accordingly, Plaintiff has shown that the linked emulators are a "technology" that is primarily designed for the purpose of circumventing Nintendo's effective technological measures, in violation of Section 1201(a)(2)(A).

Plaintiff has also shown a violation of Section 1201(a)(2)(B).  Emulators such as Yuzu and Ryujinx have only a limited commercially significant purpose or use aside from circumventing Nintendo's technological measures.  Both emulators were created using open-source code, meaning anyone could copy Yuzu's or Ryujinx's code and make their own emulator for free, like the Battle.net emulator in *Davidson & Ass'cs, Inc.*  [*Id.* at ¶ 45] Thus, Plaintiff has shown that emulators are a "technology" that have only limited commercially significant purpose or use other than to circumvent Nintendo's technological

measures. And Plaintiff has demonstrated that Defendant has offered these emulators to the public. [*Id.* at ¶¶ 70-73]

Further, Plaintiff alleges that Defendant has posted public links to unauthorized copies of games and keys that circumvent Nintendo's technological measures. [*Id.* at ¶ 112] This includes Nintendo's cryptographic keys. [*Id.*] Nintendo's cryptographic keys effectively control access to Nintendo games because, in the ordinary course of operation, Nintendo's games cannot be decrypted and played unless a user has been provided with a copy of a cryptographic key by Nintendo. [*Id.* at ¶ 34] Unauthorized copies of Nintendo's cryptographic keys are primarily, if not solely, designed for the purpose of circumventing Nintendo's game encryption technology. The keys are technology that have no commercial purpose outside of enabling unauthorized decryption of Nintendo games. Thus, Defendant's public posting of the emulators and cryptographic keys violated Section 1201(a)(2)(B).

Accordingly, Plaintiff has shown that Defendant's posting of links to emulators and cryptographic keys constitutes a violation of both Section 1201(a)(2)(A) and 1201(a)(2)(B).

### 4.    Count Five

In Count Five, Plaintiff alleges that Defendant trafficked in circumvention technology in violation of 17 U.S.C. § 1201(b)(1). [*Id.* at ¶¶ 117-29] That Section provides:

> No person shall manufacture, import, offer to the public, or otherwise traffic in any technology, product, service, device, component, or part thereof, that --
>
> (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure

that effectively protects a right of a copyright owner under [Title 17] in a work or portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under [Title 17] in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under [Title 17] in a work or a portion thereof.

17 U.S.C. §§ 1201(b)(1)(A)-(C). To circumvent protection afforded by a technological measure "means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure." *Id.* § 1201(b)(2)(A). A technological measure effectively protects a right of a copyright owner "if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title." *Id.* § 1201(b)(2)(B). "Section 1201(b) is very similar to Section 1201(a)(2). But (a)(2) focuses on effectively controlling access and (b) focuses on effectively protecting a right of a copyright owner," such as the exclusive right to make copies of the protected work. *Datel Holdings LTD. v. Microsoft Corp.*, No. C-09-05535 EDL, 2010 WL 3910344, at *3 (N.D. Cal. Oct. 4, 2010) (quoting *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 939 (N.D. Cal. 2009)).

Nintendo's technological measures effectively protect Nintendo's right to exclusive reproduction of its games. In the ordinary course of operation, Nintendo's technological measures prevent encrypted game files from being copied off a secure cartridge or console. [#1 at ¶ 120] Plaintiff alleges that emulators are designed, implemented, and used to circumvent Nintendo's technological measures which prevent users from making

unauthorized reproductions of Switch games.  [*Id.* at ¶ 122]  As previously described, emulators such as Yuzu and Ryujinx are primarily designed for the purpose of evading Nintendo's technological measures, including measures that effectively protect Nintendo's exclusive rights to reproduce and distribute its copyrighted works.  [*Id.* at ¶ 37] Additionally, the emulators have little if any commercial value outside of circumventing Nintendo's technological measures because they are open-source projects and are thus free for the public to replicate.  [*Id.* at ¶ 45]  And Defendant offered emulator technology to the public by posting links to them publicly online.[11]  [*Id.* at ¶ 70]

Accordingly, Plaintiff has shown that Defendant violated Sections 1201(b)(1)(A)-(B) when he offered the emulators to the public by posting them publicly on social media.

### B.    Relief Requested

"Default judgment cannot be entered against defaulting defendants until the amount of damages has been ascertained."  *Malluk v. Berkeley Highlands Prods., LLC,*

---

[11] Plaintiff also alleges that Defendant's public posting of cryptographic keys and software violated Section 1201(b)(1).  [*Id.* at ¶ 125]  Initially, Plaintiff does not explain what it means by "software."  The Complaint alleges that Defendant publicly posted links to emulators, cryptographic keys, and repositories of Nintendo ROMs.  [*Id.* at ¶¶ 62, 70-71] Repositories of ROMs are not circumvention technologies or devices.  They simply contain unauthorized links to Nintendo games, which can be played if circumvention technologies are used to decrypt them, among other necessary steps.  [*Id.* at ¶ 41]  And with respect to the cryptographic keys, it is unclear in what manner the cryptographic keys effectively protect Nintendo's rights outside of simply controlling access to Nintendo's copyrighted games.  Plaintiff makes the conclusory allegation that providing links to cryptographic keys and other software "facilitates the unauthorized reproduction and play of Nintendo games."  [*Id.*]  But the cryptographic keys themselves do not do anything to prevent a user from replicating a game.  The keys enable a person to access a game. [*Id.* at ¶ 42]  There is no allegation that the key itself contains any functionality that prevents a person from replicating a game.  Rather, Switch console's technological measures, evaded using an emulator, are what prevent such replication.  Therefore, Defendant's posting of cryptographic keys and other software did not violate Section 1201(b)(1).

611 F. Supp. 3d 1134, 1137 (D. Colo. 2020) (citing *Herzfeld v. Parker*, 100 F.R.D. 770, 773 (D. Colo. 1984)).  "A court may enter a default judgment without a hearing if the amount claimed is a liquidated sum or one capable of mathematical calculation."  *Id.* at 1138 (citing *Venable v. Haislip*, 721 F.2d 297, 300 (10th Cir. 1983)).  Statutory damages for copyright infringement are considered by courts to be "capable of mathematical calculation; therefore, an evidentiary hearing is not necessary."  *Bittichesu v. Premier Renewables LLC*, No. 23-cv-00340-CNS-KLM, 2023 WL 4847584, at *4 n.2 (D. Colo July 28, 2023) (citing *Hunt v. Inter-Globe Energy, Inc.*, 770 F.2d 145, 148 (10th Cir. 1985)).

### 1.    Statutory Damages Pursuant to 17 U.S.C. § 504

For Defendant's direct infringement of Nintendo's copyright, Plaintiff seeks a single statutory damages award for a representative work.  [#33 at 12]  Specifically, Plaintiff seeks an award of $10,000 for infringement of *Paper Mario: The Thousand Year Door*. [*Id.*]

A copyright owner may seek actual damages or statutory damages from a direct infringer.  17 U.S.C. §§ 504(a)(1)-(2).  Section 504(c)(1) permits statutory damages "in a sum of not less than $750 or more than $30,000 as the court considers just."  *Id.* § 504(c)(1).  A court may increase damages up to $150,000 if the infringement is willful.  *Id.* § 504(c)(2).  "An award of statutory damages is particularly appropriate in the default judgment context because the information needed to prove actual damages is within the infringers' control."  *Your True Nature, Inc. v. JF Show Store*, 2024 WL 3340974, at *7 (D. Colo. June 21, 2024) (quotation omitted), *report and recommendation adopted*, 2024 WL 5483408 (D. Colo. July 26, 2024).  In such cases, courts often award damages in an

amount of two or three times the amount of a licensing fee. *Id.* (citing *Girlsongs v. 609 Indus.*, 625 F. Supp. 2d 1127, 1128 (D. Colo. 2008)).

"The Court has broad discretion 'to assess what is just in a particular case, considering the nature of the copyright, the circumstances of the infringement and the like,' so long as the award is neither more than the maximum nor less than the minimum." *Bittichesu*, No. 23-cv-00340-CNS-KLM, 2023 WL 4847584, at *4 (quoting *Broad. Music, Inc. v. Carey-On-Saloon, LLC*, No. 12-cv-02109-RM-MJW, 2014 WL 503447, at *6 (D. Colo. Feb. 7, 2014)). The statutory damages provision does not merely "compel[] restitution of profit and reparation for injury but [it] also is designed to discourage wrongful conduct.'" *Id.* (quoting *F.W. Woolworth Co. v. Contemp. Arts, Inc.*, 344 U.S. 228, 233 (1952)). Accordingly, in determining a statutory damages award, the Court may consider "the need for deterrence and punishment of the defendant" and "the degree of culpability in the defendant's infringing conduct." *Grady v. Nelson*, No. 12-cv-03004-RM-KMT, 2014 WL 7143852, at *9 (D. Colo. Dec. 15, 2014).

The circumstances of the infringement are important in this case. Defendant has engaged in unauthorized streaming of Nintendo games for more than two years and on at least 50 occasions. [#1 at ¶ 3] Nintendo has submitted "dozens" of takedown notices pursuant to the Copyright Act to get Defendant's live streams removed from various social media websites. [*Id.*] Defendant's channels on live streaming and video platforms have been shut down due to copyright violations. [*Id.*] Rather than refraining from continuing to violate copyright law, Defendant instead sent emails to Nintendo stating that he has "a

thousand burner channels" and "can do this all day," implying that copyright law will not prevent Defendant from engaging in infringing activities.  [*Id.*]

Defendant's culpability is clear.  "Acting 'willfully' means acting with knowledge that one's actions constitute copyright infringement."  *Grady*, 2014 WL 7143852, at *9 (citing *Merch. Media, LLC v. H.S.M. Int'l*, No. 05 Civ. 2817(JES), 2006 WL 3479022, at *4 (S.D.N.Y. Nov. 30, 2006)).  Defendant was notified, via takedown notices and removal of his social media channels for copyright infringement, that his streaming activities violated the law.  [#1 at ¶ 3]  Defendant nonetheless continued to engage in infringing conduct and taunt Nintendo via email despite knowing that his activities violated the law.  [*Id.*]

 Additionally, when a defendant fails to appear in and defend a lawsuit in court, willfulness may be inferred.  *Grady*, 2014 WL 7143852, at *9.  Defendant has not appeared in this matter.  Indeed, the record suggests that Defendant intentionally evaded service.  [*See* #11 at 9-11]  Accordingly, Plaintiff has shown that Defendant willfully infringed on Nintendo's copyright.

A finding of willful infringement permits a court to increase statutory damages up to $150,000, 17 U.S.C. § 504(c)(2), but the court maintains broad discretion to determine the amount of damages that is just in a particular case.  Though courts often look to plaintiffs' licensing fees to determine the amount of statutory damages that should be awarded, this approach is unlikely to be helpful here.  It is improbable that Plaintiff would have a representative licensing fee for allowing an individual to stream a game before it is released.  There is no evidence that suggests Plaintiff has ever given an individual a

license of such nature in the past.  The Court thus looks to other cases to determine the appropriate amount of statutory damages to award here.

In one case, an individual sold 3100 game cartridges that contained between 10 and 12 of Nintendo copyrighted games on each cartridge.  *Nintendo of Am., Inc. v. Dragon Pac. Int'l.*, 40 F.3d 1007, 1009-10 (9th Cir. 1994).  Thirteen separate Nintendo copyrights were willfully infringed.  *Id.*  The court found that $5,000 per violation was an appropriate statutory damages award.  *Id.* at 1010.  And that award was given more than 30 years ago.

In another case, Nintendo sued an individual who uploaded copies of Nintendo's copyrighted video games onto a website and continued to maintain the site even after Nintendo sent a notice alleging copyright infringement.  *Nintendo of Am., Inc. v. Storman*, CV 19-7818-CBM-(RAOx), 2021 WL 4780329, at *5 (C.D. Cal. Aug. 5, 2021).  The defendant was found to have violated 49 of Nintendo's copyrights.  *Id.* at *6.  The court held that $35,000 in statutory damages per infringing work, considering the willfulness of the conduct and Nintendo's lost revenue, was appropriate.  *Id.*

In a final case involving Nintendo, a video game seller was found to have been selling video game cartridges which contained 11 games that infringed on Nintendo's copyrights.  *Nintendo of Am., Inc. v. Ketchum*, 830 F. Supp. 1443, 1444 (M.D. Fla. 1993).  Nintendo provided no evidence of licensing fees and "simply asked [the court] for an arbitrary amount of $50,000 per infringement based upon the finding of willful conduct."

*Id.* at 1445.  The court found that the copyright holders were entitled to statutory damages in the amount of $2,000 for each infringement, without further elaboration.  *Id.*

Plaintiff here is essentially requesting a statutory damages award of $1,000 per instance of direct copyright infringement, though Plaintiff states it is simply asking for $10,000 in damages for infringement of a single game.  The Court finds that this award is consistent with the awards given in these other cases involving copyright infringement of video games, and the Court finds that this award is appropriate.  The requested damages fall squarely within the range permitted by section 504(c)(1), especially considering the willful and blatant nature of Defendant's conduct.  Accordingly, the Court respectfully RECOMMENDS awarding Plaintiff $10,000 in statutory damages for Defendant's direct infringement of Nintendo's copyrights.

### 2.    Statutory Damages Pursuant to 17 U.S.C. § 1203

For Defendant's circumvention and trafficking activities, Plaintiff seeks statutory damages of $500 each for 15 violations, totaling $7,500.  [#33 at 13]  The 15 violations include circumvention of technological measures for the ten games that Defendant streamed before their release dates, distribution of four links to Switch emulators, and distribution of one link to cryptographic keys.  [*Id.*]

When a person violates Section 1201 or 1202, the complaining party may elect to recover either actual damages or statutory damages.  17 U.S.C. § 1203(c)(1).  Awarded statutory damages should be a "sum of not less than $200 or more than $2,500 per act

of circumvention, device, component, offer, or performance of service, as the court considers just." *Id.* §§ 1203(c)(3)(A)-(B).

The Court looks to other cases in this District to determine whether Plaintiff's requested damages are appropriate and just. In one case, a defendant was found to have made an unauthorized alteration of a photograph's copyright management information by removing information about the author and adding the defendant's own information. *Guarneros v. Denver Green Party*, No. 1:19-cv-00139-RM-NYW, 2020 WL 7055493, at *1 (D. Colo. Dec. 2, 2020). The defendant publicly posted this altered image. *Id.* The Court awarded $10,000 in statutory damages for this single violation of section 1202(b). *Id.* at *5. In a case with a similar fact pattern, involving photographs that were altered such that copyright management information was removed, the court awarded $10,000 in statutory damages per violation for 34 willful violations of section 1202. *Stockart.com, LLC v. Engle*, No. 10-cv-00588-MSK-MEH, 2011 WL 10894610, at *14 (D. Colo. Feb. 18, 2011). In another case in this District, the Court found that an award of $2,500 was an appropriate award for a single violation of section 1202. *Fallen Prods., Inc. v. Bray*, No. 20-cv-3170-RMR-NRN, 2022 WL 22864396, at *5 (D. Colo. Mar. 28, 2022). This case similarly involved a defendant who altered copyright management information to conceal infringement. *Id.*

Here, Plaintiff seeks $500 per established violation of section 1201 and 1202. Given the statutory damages awarded in other cases in this District and the willful nature of Defendant's conduct, the Court finds that this award is just. Though this case does not involve manipulation of copyright management information on photographs, it instead involves the more sophisticated violative conduct of circumventing multiple copyright

protecting technologies within video games and their consoles.  Accordingly, the Court respectfully RECOMMENDS awarding Plaintiff $7,500 in statutory damages for 15 violations.

### 3.    Permanent Injunction

Plaintiff seeks a permanent injunction against Defendant which would: (1) prevent Defendant from infringing Nintendo's copyrighted works and trafficking in Switch emulators, proprietary cryptographic keys, or other circumvention technologies; (2) prevent third parties working in concert with Defendant that have notice of this Order from engaging in the same conduct; and (3) require Defendant to destroy all circumvention devices in Defendant's possession.  [#33 at 14-15]

Pursuant to 17 U.S.C. § 502(a), a plaintiff may obtain a temporary or permanent injunction for copyright infringement as the court "may deem reasonable to prevent or restrain infringement of a copyright."  In addition, pursuant to 17 U.S.C. § 1203(b)(1), a court "may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation" of section 1201.  Courts may also order "the impounding, on such terms as it deems reasonable, of any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation."  17 U.S.C. § 1203(b)(2).

A party seeking a permanent injunction must prove: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Sw. Stainless, LP v. Sappington*, 582 F.3d 1177, 1191 (10th Cir. 2009) (quoting *Prairie Band Potawatomi*

*Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007)). "A copyright holder that establishes past infringement and a substantial likelihood of infringement in the future is normally entitled to a permanent injunction against the infringer pursuant to § 502(a)." *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1555 (10th Cir. 1996).

Here, Plaintiff demonstrated Defendant's liability and therefore, success on the merits. Plaintiff has thus established past infringement. Based both on Defendant's taunting/bragging about his infringing acts and his failure to refrain from copyright infringement despite numerous notices, Plaintiff has also demonstrated a substantial likelihood that Defendant will infringe in the future. [#1 at ¶ 3] Accordingly, a permanent injunction appears appropriate in this case.

Nevertheless, the Court must address the remaining factors of the permanent injunction test. Courts have found that the second element may be shown when an infringer continues to infringe despite multiple cease-and desist letters and the copyright holder cannot otherwise control the infringer. *Viacom Int'l Inc. v. Baca*, No. Civ. 18-112 JCH/KRS, 2018 WL 6003539, at *6 (D.N.M. Nov. 15, 2018). Additionally, "irreparable harm findings are based on such factors as the difficulty in calculating the damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position." *DP Creations, LLC v. Xiaoxia*, No. 2:22-cv-00765-TS-DAO, 2023 WL 3851799, at *3 (D. Utah June 6, 2023) (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004)). Based on assertions

such as a plaintiff's loss of reputation, loss of goodwill, and lost sales, a court may find that a plaintiff has demonstrated irreparable harm unless an injunction is issued. *Id.*

Here, Plaintiff has shown irreparable harm in that Defendant continues to violate Plaintiff's copyright despite many of his social media channels and posts being removed for copyright violations. Plaintiff is evidently unable to control Defendant through non-injunctive methods. It is unknown how many people were spoiled as to pre-released games or who chose not to purchase Nintendo's games after watching Defendant's live streams, but certainly some of this occurred. And Plaintiff plausibly alleges that it has experienced a loss of goodwill because of Defendant's infringing activities. [#1 at ¶ 44] Accordingly, Plaintiff has demonstrated irreparable harm unless an injunction is issued.

Under the third factor of the test, courts note that copyright infringers are not generally harmed by a permanent injunction when they intentionally appropriate copyrights and have been repeatedly warned about their infringing conduct. *Viacom International Inc.*, 2018 WL 6003539, at *6. Indeed, courts have stated that there is no hardship to a defendant where "a permanent injunction will prevent them from engaging in further illegal activity." *DP Creations, LLC*, 2023 WL 3851799, at *4. Here, Defendant will not be harmed by being required to follow the law. The permanent injunction in this case will require Defendant to avoid infringing Nintendo's copyrights and avoid trafficking in technologies that allow others to infringe Nintendo's copyrights. Plaintiff will be harmed more substantially if an injunction is not issued because Plaintiff may lose additional

goodwill and customers.  Thus, Plaintiff has shown that the threatened injury outweighs the harm that the injunction may cause the opposing party.

As to the fourth factor, an injunction will not adversely affect the public interest if "it will protect copyrighted material and encourage compliance with the Copyright Act."  *Id.* (quotation omitted).  Applying that principle here, the public interest will not be adversely affected by the court requiring Defendant to follow the law.

Therefore, all four elements weigh in favor of issuing a permanent injunction in favor of Plaintiff.  Accordingly, the Court finds that Plaintiff is entitled to an injunction preventing Defendant from infringing Nintendo's copyrighted works, including by streaming, and from trafficking in Switch emulators, Nintendo's proprietary cryptographic keys, or other software or technologies that circumvent Nintendo's technological protective measures.

Nevertheless, the Court does not see fit to recommend the issuance of all three parts of the injunction requested by Plaintiff.  Plaintiff seeks, in part, an injunction against third parties working in concert with Defendant and with notice of the injunction.  [#33 at 14-15]  However, Plaintiff's Complaint does not allege that Defendant is working in concert with any third party.  Therefore, Plaintiff has made no showing that it would experience irreparable harm without such an injunction being issued.

Additionally, Plaintiff seeks a provision requiring Defendant to destroy all circumvention devices in Defendant's possession.  [*Id.* at 15]  However, the Court is unclear what purpose this would serve or what devices would be covered by this provision.  As alleged, all the known technologies Defendant used to circumvent Nintendo's technological measures are available for free on the Internet if one has the

proper link.  There is no express allegation that Defendant owns any specific device or product that aids in circumventing Nintendo's technological measures.  It appears that Defendant could have engaged in circumvention using any device which could connect to the Internet. Defendant has posted public links to emulators, cryptographic keys, and ROM repositories and there is no allegation that Defendant himself produced any of these technologies: they are unfortunately available to those who seek them online.  [*Id.*  at 3] Thus, the Court cannot identify what "circumvention devices" are in the possession of Defendant.  Given that neither the Complaint nor the Motion identify with any reasonable certainty what devices or products were used in Defendant's circumvention activities, the Court does not find it reasonable to issue an injunction with this provision.

Accordingly, the Court respectfully RECOMMENDS that the district court issue Plaintiff's requested injunction to the extent that it prevents Defendant from infringing Nintendo's copyrighted works, including by streaming, and from trafficking in Switch emulators, Nintendo's proprietary cryptographic keys, or other software or technologies that circumvent Nintendo's technological protective measures.

## IV.    CONCLUSION

For the reasons set forth above, the Court respectfully **RECOMMENDS** that Plaintiff's Motion for Default Judgment [#33] be **GRANTED IN PART** and **DENIED IN PART**.  Specifically, the Court **RECOMMENDS** that: (1) Plaintiff be awarded statutory damages in the amount $17,500; and (2) the district court issue an injunction preventing Defendant from infringing Nintendo's copyrighted works, including by streaming, and from

trafficking in Switch emulators, Nintendo's proprietary cryptographic keys, or other software or technologies that circumvent Nintendo's technological protective measures.[12]

DATED:  October 3, 2025                        BY THE COURT:

                                                         s/Scott T. Varholak
                                                         Chief United States Magistrate Judge

---

[12] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings of fact, legal conclusions, and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review."  *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings of fact, legal conclusions, and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings of fact, legal conclusions, and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (holding that the district court's decision to review magistrate judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of magistrate judge's order by failing to object to those portions); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the magistrate judge's ruling by failing to file objections).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).